921 A.2d 273

**Gerald Eugene WISNESKI**

v.

**STATE of Maryland.**

**No. 76, Sept. Term, 2006.**

Court of Appeals of Maryland.

April 18, 2007.

Piedad Gomez, Asst. Public Defender (Nancy S. Forster, Public Defender, on brief), for petitioner.

Diane E. Keller, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen., on brief), for respondent.

Argued before BELL, C.J., RAKER, CATHELL, HARRELL, BATTAGLIA, GREENE and ALAN M. WILNER (Retired, specially assigned), JJ.

BATTAGLIA, J.

Petitioner, Eugene Wisneski, while a guest in a private home, suddenly exposed his genitalia to three other people in the room, who were not family members and who were deeply offended by that conduct. There was no evidence whether anyone outside the home did see or could have seen what he had done. For the behavior, Wisneski was convicted in the Circuit Court for Montgomery County of the common law crime of indecent exposure. In this appeal, he contends that, because the offense requires that the exposure be in a "public place," his exposure to casual observers in a private home does not suffice to constitute the offense.[1] We disagree.

## I. Background

At noontime on July 1, 2005, Brandon James visited his neighbor Bridgette Penfield in her home in Germantown, Maryland, and remained for about two hours, talking with her and another neighbor who also was visiting, Petitioner, Gerald Eugene Wisneski; both Wisneski and Penfield were drinking beer. Brandon returned to Penfield's home about five hours later with his fifteen-year-old sister, Jennifer James. Wisne-

---

1. *Wisneski* presented to us one question, for which we granted certiorari, 395 Md. 420, 910 A.2d 1061 (2006):

   Does the "public place" element of the common law offense of indecent exposure require exposure in a public place, or is a non-consensual exposure by an invited guest inside a private home to three people who are not members of his family or his household and where the exposure is not visible outside of the private home to casual observers, sufficient to constitute the crime?

ski had not left Penfield's home since Brandon's previous visit and had continued to drink beer. About twenty minutes later, Wisneski asked Jennifer if she "was on her period," stood up,[2] and exposed his penis and testicles to her, shaking them and repeating the question of whether "she was on her period." Jennifer immediately turned her head away while Wisneski, who after clothing himself, began grabbing his genitals from outside of his shorts and shaking them in Jennifer's direction. Catching sight of Wisneski's actions, Brandon became enraged, challenging Wisneski to fisticuffs and prompting Wisneski to jump out of his seat and abruptly leave the home.[3]

At trial, the State called four witnesses, Brandon and Jennifer James, and the two arresting officers, Brian Blakesley and W.R. Morgan of the Montgomery County Police Department.[4] Wisneski did not call any witnesses.

Jennifer was the State's first witness:

THE STATE: Jennifer, do you recall if you saw Mr. Wisneski on July 1st of this year around 7 o'clock in the evening?

---

**2.** Jennifer testified that Wisneski "was sitting on the ... big couch facing ... the big window pane," while Brandon testified that he was "[s]itting in the chair beside the window." There was no testimony, however, as to whether the window had curtains, blinds, or any other form of treatments, or whether the treatments were open or closed.

**3.** Wisneski was subsequently arrested while walking to his home from Penfield's. The police searched the shopping bag he was carrying and discovered a handgun containing two live rounds. In addition to the indecent exposure, he was charged with one count of possession of a regulated firearm having been convicted of a crime of violence in violation of Section 5–133(c) of the Criminal Law Article, one count of possession of a regulated firearm having been convicted of a disqualifying crime in violation of Section 5–133(b) of the Public Safety Article, one count of wearing, carrying and transporting a handgun on and about his person in violation of Section 4–203(a)(1)(i) of the Criminal Law Article, of which he was convicted. None of the handgun convictions is challenged before this Court.

**4.** Although the State had subpoenaed Bridgette Penfield, the Assistant State's Attorney reported at trial that she had checked herself into a hospital and would not be available to testify and requested that the trial proceed without Penfield's testimony.

JENNIFER: Yes, I did.

THE STATE: Where did you see Mr. Wisneski that day?

JENNIFER: In [Penfield's] house.

THE STATE: Okay, who's [Penfield]?

JENNIFER: Our next door neighbor.

THE STATE: Okay. Why don't you tell the Court what you were doing there that day.

JENNIFER: I was there talking to [Penfield] and [Wisneski] was there. He was drunk, and he just started talking sexual stuff to me.

\* \* \*

JENNIFER: He was sitting in [Penfield's] house. He was drinking beer and then he just started asking was I on my period and stuff.

THAT STATE: Okay. Let's go to that then. When he said that to you, what exactly did he say to you?

JENNIFER: Was I on my period and—

THE STATE: Okay. And when he said that did he do anything? What did he do?

\* \* \*

JENNIFER: He pulled out his penis and his other thing.

THE STATE: His testicles?

JENNIFER: Yeah.

THE STATE: Okay. Now, when he pulled them out what do you mean? What did he do?

JENNIFER: He s[hoo]k them at me.

THE STATE: Okay. What was he wearing?

JENNIFER: He was wearing shorts I believe. I think it was shorts.

\* \* \*

THE STATE: After he pulled out his, after he exposed himself to you, what did you do?

JENNIFER: I turned my head real fast. And that's when my brother seen it.

\*　　\*　　\*

THE STATE: Okay. At any point did Mr. Wisneski cover himself back up?

JENNIFER: Yes, he put it back in his pants and when he put it back in his pants he put his hand on his pants and his private part and started shaking it.

On cross-examination, the following colloquy occurred:

THE DEFENSE: And you and your brother frequented [Penfield]'s place often did you? It's across the street?

JENNIFER: Yeah, we used to be in there playing cards.

\*　　\*　　\*

THE DEFENSE: Now, when you went in where was Mr. Wisneski seated?

JENNIFER: He was sitting on the, on the big couch facing like the big window pane.

THE DEFENSE: Okay. And where was [Penfield] sitting?

JENNIFER: [Penfield] was sitting on the edge or on the other chair, I can't really, the way her couch is set up, her furniture there's a big chair and then there's another chair beside it.

THE DEFENSE: Okay.

JENNIFER: But I think she was sitting on the edge of that big couch.

THE DEFENSE: And just the two of them were there when you arrived? Yes?

JENNIFER: Yes.

\*　　\*　　\*

THE DEFENSE: And now you said he exposed himself to you?

JENNIFER: Yeah, but when I, when I first walked in—

THE DEFENSE: He didn't expose himself?

JENNIFER: He, not until like 20 minutes later.

THE DEFENSE: Okay. And when he exposed himself to you did he stand up?

JENNIFER: Yes.

THE DEFENSE: He stood up? Okay. And did he pull his pants down?

JENNIFER: He lifted up the bottom of his shorts and that's when he pulled out his penis and his, his other thing. I don't know how to say it.

The State then called Brandon to testify:

THE STATE: When you and your sister got there what did he do? What did the defendant do?

BRANDON: He asked my sister was she on her period and started shaking his thing at her.

THE STATE: All right, when you say start shaking his thing at her what do you mean?

BRANDON: I don't know how ya'll like me to say it. Penis.

THE STATE: Okay. Was he covered when he was shaking at her or was it uncovered when he was shaking it at her?

BRANDON: Uncovered.

The following testimony was elicited on cross-examination:

THE DEFENSE: Now, when you got [to Penfield's house] where was Mr. Wisneski? Where was he?

BRANDON: Sitting in the chair beside the window.

THE DEFENSE: Sitting in the chair?

BRANDON: Yeah, a recliner.

THE DEFENSE: And where was [Penfield]?

BRANDON: Sitting on the couch straight across from him.

\* \* \*

THE DEFENSE: And you left [Penfield] and Mr. Wisneski there still drinking beer?

BRANDON: Yes.

THE DEFENSE: Okay. And you came back with your sister is that right?

BRANDON: Yes.

THE DEFENSE: Okay. And you indicated that Mr. Wisneski did something unusual is that right?

BRANDON: Yes.

THE DEFENSE: Do you recall what he was wearing that day?

BRANDON: I believe he had some shorts on.

\* \* \*

THE DEFENSE: Now, you indicated that Mr. Wisneski exposed himself is that right?

BRANDON: Yes.

THE DEFENSE: He dropped his pants?

BRANDON: He ain't dropped them completely.

THE DEFENSE: But he pulled them down enough to show his genitals.

BRANDON: Yeah, he pulled them down enough to show his genitals.

The State also called the two police officers, who testified to the details surrounding the arrest of Wisneski, after which the State rested its case, prompting Wisneski to make a motion for judgment of acquittal, which the court denied. Wisneski then rested his case and renewed his motion for acquittal with respect to the charge for indecent exposure, arguing that the interior of Penfield's home did not constitute a "public place" as the offense required. The court again denied the motion, reasoning that "as I read the definition, if it occurs under circumstances where it could be seen by other people if they happen to look, that constitutes a public place."

The jury was then charged with the following instruction, to which Wisneski took no exception:

In order to convict the defendant of indecent exposure you must find beyond a reasonable doubt that the defendant intentionally exposed his penis or other body part that should not be exhibited in a public place. Indecent exposure, to amount to a crime, must have been done intentionally. Intent may be inferred from the conduct of the

accused and the circumstances and the environment of the occurrence.

An exposure becomes indecent ... when [a] defendant exposes himself at such a time and place that, as a reasonable man, he knows or should know his act will be open to the observation of others. *An exposure is public or in a public place if it occurs under such circumstances that it could be seen by a number of persons if they were present and happen to look. It is immaterial that the exposure is seen by only one person if it occurs at a place open or exposed to the view of the public and where anyone who happened to have been nearby could have seen had he looked.*

(emphasis added). The jury found Wisneski guilty of indecent exposure, as well as various handgun charges, and the court imposed a five year sentence for the illegal possession of a regulated firearm by a person previously convicted of a crime of violence, merged the other handgun convictions, and also imposed a consecutive six-month sentence for the crime of indecent exposure.

Wisneski noted a timely appeal to the Court of Special Appeals, which affirmed his conviction for indecent exposure in a reported opinion, *Wisneski v. State,* 169 Md.App. 527, 905 A.2d 385 (2006), concluding that Wisneski had exposed himself in the home of a third party, in daylight, while in a room that had a "big window pane." The intermediate appellate court determined that, although there was insufficient evidence for the jury to determine whether Wisneski was visible to passers-by outside the window, his conduct still amounted to indecent exposure because, as a guest in a private home, he had exposed himself intentionally, as opposed to inadvertently, to three persons who were not members of his family or household, without their permission or consent, in an area of the house not regarded as private, such as a bathroom. *Id.* at 551–52, 905 A.2d at 399. The Court of Special Appeals held that, under those circumstances, the exposure had occurred in the open and was observed by others, thereby constituting an exposure in a "public place." *Id.*

Before this Court, Wisneski contends that, under the common law offense of indecent exposure, it is not the conduct of exposing oneself which the common law seeks to criminalize, but the public nature of the exposure. He argues that an indecent exposures occurs in a "public place" if, under our holding in *Messina v. State*, 212 Md. 602, 605–06, 130 A.2d 578, 579–80 (1957), it is "likely to be seen by a number of casual observers." Citing *Messina, Regina v. Webb*, 1 Den. 338 (1848), and *State v. Goldstein*, 72 N.J.L. 336, 62 A. 1006 (1906), he argues that, in this case, "casual observers" were those individuals who may have been passing by the outside of Penfield's home, and not those inside the home as invited guests. Wisneski therefore maintains that the "public" element of the common law crime of indecent exposure is satisfied only if members of the public casually passing by would be likely to see the exposure and one or more actually did see it, or if the exposure occurs within a place "that is for the time being open to a portion of the public, as distinguished from a private room," citing *Lockhart v. State*, 116 Ga. 557, 42 S.E. 787 (1902), *Morris v. State*, 109 Ga. 351, 34 S.E. 577 (1899), and *Byous v. State*, 121 Ga.App. 654, 175 S.E.2d 106 (1970). Wisneski argues that these precepts are consistent with the common usage of the term "public place," as well as the Supreme Court's distinction between the public realm and private domain enunciated in *United States v. Karo*, 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984), and *Kyllo v. U.S.*, 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001). He, therefore, alleges that, because Penfield's home was a private residence, not open for general use by the public, and because he was not visible to passers-by, Penfield's home did not constitute a "public place" under the common law offense of indecent exposure.

Conversely, the State cites *Messina* and *Regina v. Wellard*, 15 Cox, C.C. 559 (1884), for the proposition that the circumstances dictate whether the common law crime of indecent exposure occurred, so that a place is public when members of the public are present. The State alleges that, under *Messina*, an exposure occurs in a public place if it is visible to

"casual observers" because, under the circumstances, it could "be seen by a number of persons, if they were present and happened to look." 212 Md. at 605–06, 130 A.2d at 579–80. The State, therefore, contends that indecent exposure can occur within the confines of a private building even without evidence indicating that an exposure could be viewed from outside the building, citing *State v. Pallman*, 5 Conn.Cir.Ct. 202, 248 A.2d 589 (1968), *People v. Legel*, 24 Ill.App.3d 554, 321 N.E.2d 164 (1974), and *Greene v. State*, 191 Ga.App. 149, 381 S.E.2d 310 (1989), in support. The State further maintains that the characterization of a "private" home, versus a public place, for purposes of the Fourth Amendment protection against unreasonable searches and seizures is in no way applicable to the case at bar because this case does not implicate those protections, nor did the exposure occur in Wisneski's home, where he might have a legitimate expectation of privacy.

## II. Analysis

In this case we are called upon to determine whether an indecent exposure that occurs within a private residence can constitute a "public" exposure for purposes of the offense of indecent exposure, and whether there was sufficient evidence presented at trial for the jury to determine that Wisneski's conduct satisfied the "public" element of the offense. We set forth the appropriate standard for reviewing sufficiency of the evidence in *Harrison v. State*, 382 Md. 477, 855 A.2d 1220 (2004), stating:

The standard of review for appellate review of evidentiary sufficiency is whether any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt. *See State v. Albrecht*, 336 Md. 475, 478–79, 649 A.2d 336, 337 (1994). We view the evidence in the light most favorable to the prosecution. *See id.* (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979) and *Branch v. State*, 305 Md. 177, 182–83, 502 A.2d 496, 498 (1986)). We give "due regard to the [fact finder's] finding of facts, its resolution of conflicting evi-

dence, and, significantly, its opportunity to observe and assess the credibility of witnesses." *McDonald v. State*, 347 Md. 452, 474, 701 A.2d 675, 685 (1997), cert. denied, 522 U.S. 1151, 118 S.Ct. 1173, 140 L.Ed.2d 182 (1998) (quoting *Albrecht*, 336 Md. at 478, 649 A.2d at 337).

*Id.* at 487–88, 855 A.2d at 1226, quoting *Moye ι. State*, 36. Md. 2, 12–13, 796 A.2d 821, 827 (2002).

■ In Maryland, the crime of indecent exposure is a common law offense, originally derived from English common law when our Declaration of Rights was adopted on November 3, 1776, Article 3 of which originally provided, in pertinent part, "[t]hat the Inhabitants of Maryland are entitled to the Common Law of England ... subject, nevertheless, to the revision of, and amendment or repeal by, the Legislature of this State." Md. Decl. of Rights, Art. 3.[5]

In order to examine properly the public element of common law indecent exposure, therefore, we then must explore English common law extant in 1776 in which the offense of indecent exposure constituted a misdemeanor. Sir William Blackstone commented generally:

[M]isdemeanors are a breach and violation of the public rights and duties, owing to the whole community, considered as a community, in its social aggregate capacity ... All crimes ought therefore to be estimated merely according to the mischiefs which they produce in civil society: and, of consequence, private vices, or the breach of mere absolute duties, which man is bound to perform considered only as an individual, are not, cannot be, the object of any municipal law; any farther than as by their evil example, or other pernicious effects, they may prejudice the community, and thereby become a species of public crimes. Thus the vice of drunkenness, if committed privately and alone, is beyond the knowledge and of course beyond the reach of human tribunals: but if committed publicly, in the face of the

---

**5.** This provision was reconstituted as Article 5 of the Maryland Declaration of Rights in 1867.

world, its evil example makes it liable to temporal censures.... The only difference is, that both public and private vices are subject to the vengeance of eternal justice; and public vices are besible liable to the temporal punishments of human tribunals.

\* \* \*

Upon the whole therefore, though part of the offenses to be enumerated in the following sheets are of the offense against the revealed law of God, others against the law of nature, and some are offenses against neither; yet in a treatise of municipal law we must consider them all as deriving their particular guilt, here punishable, from the law of man.

Having premised this caution, I shall next proceed to distribute the several offenses ... first, those which are more immediately injurious to God and his holy religion.

\* \* \*

The last offense which I shall mention, more immediately against religion and morality, and cognizable by the temporal courts, is that of *open and notorious lewdness:* either by frequenting houses of ill fame, which is an indictable offense; or by some grossly scandalous and public indecency, for which the punishment is by fine and imprisonment.

William Blackstone, 4 Commentaries on the Laws of England 41–42, 64 (6th ed. 1775) (footnote omitted) (emphasis added). Thus, the offense of indecent exposure necessitating open and notorious lewdness, was an offense against morality.

Chief Judge Charles E. Orth, writing for the Court of Special Appeals, had the opportunity to explore the adopted elements of indecent exposure in *Dill v. State,* 24 Md.App. 695, 332 A.2d 690 (1975),[6] in which he iterated:

At the common law of England, to which the inhabitants of Maryland were declared to be entitled by Article 5, Declaration of Rights, Constitution of Maryland, indecent exposure

---

**6.** *See also Neal v. State,* 45 Md.App. 549, 413 A.2d 1386 (1980).

of the person was a misdemeanor. The authorities ... are in substantial accord that at the common law indecent exposure was the wilful and intentional exposure of the private parts of one's body in a public place in the presence of an assembly. Thus, its main elements were the *wilful exposure,* the *public place* in which it was performed, and the *presence of persons* who saw it.

\*     \*     \*

An exposure becomes indecent, and a crime, when defendant exposes himself at such a time and place that, as a reasonable man, he knows or should know his act will be open to the observation of others.

*Id.* at 698–700, 332 A.2d at 693–94, quoting *Messina,* 212 Md. at 606, 130 A.2d at 580 (footnote omitted) (citations omitted) (emphasis added).[7] In footnote 2, referenced in the quote

---

**7.** In 1902, the General Assembly codified one aspect of the common law offense of indecent exposure at Section 67A of Article 27, entitled "Disturbance of the Public Peace," which provided in relevant part:

Any person who shall ... wilfully act in a disorderly manner by ... indecently exposing his person on or about any steamboat wharf, dock or public waiting room, or in or about the station grounds of any railroad in the State, or in or on any steamboat, street car, electric car, railroad car, passenger train or other public conveyance ... shall, upon conviction thereof, be sentenced to a fine of not less than five dollars or more than fifty dollars and costs.

1902 Md. Laws, Chap. 281. In 1967, the statute was expanded to read "wilfully act in a disorderly manner by ... indecently exposing his or her person *on or about any public place* ..." 1967 Md. Laws, Chap. 520, codified at Md.Code (1957, 1967 Repl.Vol.), Art. 27, § 122. The statutory offense was repealed, however, in 1977 and replaced with Section 335A of Article 27, which provided the following sentencing provisions for the offense of indecent exposure:

Every person convicted of the common-law crime of indecent exposure is guilty of a misdemeanor and shall be punished by imprisonment for not more than three years or a fine of not more than $1,000, or both.

1977 Md. Laws, Chap. 384. Section 335A was recodified in 2002 without substantive changes as Section 11–107 of the Criminal Law Article, and now provides:

A person convicted of indecent exposure is guilty of a misdemeanor and is subject to imprisonment not exceeding 3 years or a fine not exceeding $1,000 or both.

after the explanation that the English common law crime was a misdemeanor, Chief Judge Orth referred to Rollin M. Perkins' discussion in his treatise on criminal law of Blackstone's recognition of the public versus private dichotomy:

> In other words private indecency was exclusively under the jurisdiction of the ecclesiastical court but public indecency of an extreme nature was indictable. And, in the early view, indecent exposure of the person was merely one form of obscene exhibition.

*Dill,* 24 Md.App. at 699 n. 2, 332 A.2d at 693 n. 3, quoting Rollin M. Perkins & Ronald M. Boyce, Criminal Law 473 (3rd Ed.1982).

In his exploration of the common law offense of indecent exposure, Chief Judge Orth relied upon our analysis in *Messina,* 212 Md. at 602, 130 A.2d at 578, wherein the defendant was convicted for exposing himself, while seated in his parked car, to two thirteen year old girls on a busy street in Baltimore City. He challenged his conviction on the ground that, because only one of the girls actually saw him, there was no "public" exposure as required at common law. We disagreed, elucidating that the exposure occurs in "public" if it occurs " 'in such a manner that the act is seen or is likely to seen by casual observers'." *Id.* at 605, 130 A.2d at 579–80. We explained that the "public" element did not require that the exposure be actually seen by more than one person if it "occur[red] under such circumstances that *it could be* seen by a number of persons, if they were present and happened to look," and thus, "it is *likely* to be seen by a number of casual observers." *Id.* at 605–6, 130 A.2d at 580 (emphasis added). Further, we explained that the exposure must have been intentional, which "may be inferred from the conduct of the

---

2002 Md. Laws, Chap. 26. We recognized in *Harris v. State,* 306 Md. 344, 509 A.2d 120 (1986), that a common law offense is revitalized with the repeal of the statutory offense and cited with approval *Neal,* 45 Md.App. at 551, 413 A.2d at 1387–88, in which the Court of Special Appeals determined that common law offense of indecent exposure was resurrected in 1977 when the statutory offense was repealed.

accused and the circumstances and environment of the occurrence." *Id.* at 606, 130 A.2d at 580. Thus,

> [a]n exposure becomes indecent, and a crime, when [a] defendant exposes himself at such a time and place that, as a reasonable man, he knows or should know his act will be open to the observation of others.

*Id.* Therefore, the "public" elements depends on the ability to be observed by others.

■ Thus, our jurisprudence clearly sets forth the three elements of indecent exposure: a public exposure, made wilfully and intentionally, as opposed to an inadvertent or accidental one; which was observed, or was likely to have been observed, by one or more persons, as opposed to performed in secret, or hidden from the view of others. By their very nature, the three elements are inextricably entwined, and our analysis of each one element enlightens our inquiry into the others. Thus, although Wisneski challenges his conviction under the one prong of the offense, alleging that he did not "publicly" indecently expose himself because his conduct occurred within the confines of a private dwelling, we look to the first two elements of the offense of indecent exposure in order to inform our inquiry into whether Wisneski "publicly" indecently exposed himself.

■ The element of intent can be express, or inferred from the circumstances and the environment of the exposure. When the defendant exposes himself at such a time and place that a reasonable person knows or should know that his or her act will be observed by others, his acts are not accidental and his intent may be inferred. *Messina*, 212 Md. at 606, 130 A.2d at 580. The intent element itself is infused with a "public" element in the distinction between accidental and wilfulness, as was explored in *Van Houten v. State*, 46 N.J.L. 16 (1884), a case in which the Supreme Court of New Jersey interpreted English common law, when faced with the situation in which the defendant had urinated outside in a place visible to the residents of several homes. The defendant challenged the following charge to the jury regarding the intent element,

which the court determined to be the correct statement of the law:

[T]he testimony must show that the exposure was not merely accidental, and in order to convict the defendant you ought to be satisfied, from the testimony, that the exposure was intentional, at such time and place, and such manner as to offend against public decency; but intent may be inferred from recklessness. It is not necessary that some witness should testify that the defendant had said that he intended to commit the act; you can infer what he intended to do from what he actually did do.

*Id.* at 18–19. Thus, reckless exposure, determined by time, place and manner, can inform intent.

■ Conversely, when the exposures does not occur at such a time, and in such a place, or manner, that a defendant's intention may be inferred, criminal sanctions have not been applied. In *Case v. Commonwealth,* 313 Ky. 374, 231 S.W.2d 86 (1950), the defendant exposed himself while standing within the doorway to the garage of his auto repair shop, which faced his home, on an unimproved lane, without being aware of any observers in the vicinity, and without doing "anything to attract ... attention to him." *Id.* at 87. The court concluded that there was insufficient evidence that the defendant had "intentionally, wilfully or designedly exposed his person," but rather, "[s]o far as the testimony reveals, it appears that anything he may have done was unintentional and inadvertent," and reversed the conviction. *Id.* at 87–88. Inadvertent exposure then may negate intent.

In *State v. Peery,* 224 Minn. 346, 28 N.W.2d 851 (1947), the defendant was charged with indecent exposure under a Minnesota statute providing that any person who willfully and lewdly exposes their body private parts in a public place is guilty of a misdemeanor. The defendant had been observed by passersby on several occasions, standing unclothed in his ground floor dormitory room in front of a window. In refusing to criminalize the defendant's conduct, the court emphasized that he had not directed attention to himself and explained that,

[t]o establish intent where the act does not occur in a public place or otherwise where it is certain to be observed, some evidence further than the act itself must be presented. Ordinarily, intent is established by evidence of motions, signals, sounds, or other actions by the accused designed to attract attention to his exposed condition, or by his display in a place so public and open that it must be reasonably presumed that it was intended to be witnessed.

*Id.* at 854. Noting that "[t]here is no evidence submitted that defendant had signaled or called to these witnesses or otherwise endeavored to direct their attention to himself," the court concluded that defendant "may have been careless or heedless, but that he did not intentionally expose himself." *Id.* at 853, 855. *See also State v. Bergen*, 141 N.H. 61, 677 A.2d 145, 147 (1996) (holding that the common law offense of indecent exposure sought to punish "intentional" and "knowing" exposures, not "merely accidental or inadvertent exposure").[8]

A "public" aspect also infuses the element of observation; it is obvious that the defendant must have "published" his indecent exposure at such a time and place that anyone who happened to have been nearby could have seen it, had he looked. *Messina*, 212 Md. at 606, 130 A.2d at 580. In *State v. Roper*, 18 N.C. (1 Dev. & Bat.) 208 (1835), the court held that an indictment charging that the defendant had indecently exposed himself within the public's view was sufficient, stating:

It is not necessary to the constitution of the criminal act, that the disgusting exhibition should have been actually seen by the public; it is enough, if the circumstances under which it was obtruded were such as to render it probable that it would be publicly seen; thereby endangering a shock

---

**8.** The dissent ignores this essential element which is, quite possibly, the gravamen of the crime of indecent exposure, when it suggests that the *inadvertent* exposure of an undressed engaged couple through a "slightly ajar" door could be successfully prosecuted. Op. at 609, 921 A.2d at 292. Further, in the other hypothetical, an exotic dancer, paid by the host at a party to perform, may not be guilty of indecent exposure because he would not have manifested the necessary intent, if he were assured, through payment for his services by the person holding the party, that his behavior was accepted by casual observers.

to modest feeling, and manifesting a contempt for the laws of decency.

*Id.* at 209.   Therefore, probability of being seen, in addition to actual observation, was sufficient.

In *State v. Martin,* 125 Iowa 715, 101 N.W. 637 (1904), the defendant also was convicted of indecent exposure under a state statute, which he challenged on the ground that his exposure was not actually seen by a victim, which the court did not find persuasive, explaining:

It does not follow from this rule that one who uncovers his person in the privacy of his own apartment, or other place where there is no reason to suppose that his act may offend the sensibilities of others, is guilty of a crime.   The words "indecent exposure" clearly imply that the act is either in the actual presence and sight of others, or is in such a place or under such circumstances that the exhibition is liable to be seen by others, and is presumably made for that purpose, or with reckless and criminal disregard of the decencies of life.   A person, if so inclined, may dress himself in nothing more substantial than the innocence of Eden, provided he does not "expose" himself in that condition.   The exposure becomes "indecent" only when he indulges in such practices at a time and place where, as a reasonable person, he knows, or ought to know, his act is open to the observation of others.

*Id.* at 638.   Again, potential exposure to others because of placement and time could constitute publication.

In *Noblett v. Commonwealth,* 194 Va. 241, 72 S.E.2d 241 (1952), the defendant challenged his conviction for indecently exposing himself while sitting in a car on the side of the street based upon the fact that only one person saw him.   The court affirmed the conviction, stating that at common law, it mattered not that only one person saw the defendant's conduct; rather, the determinative factor was whether, under the circumstances of the case, the defendant "could reasonably have been seen, or was likely to have been seen by persons using the street."   *Id.* at 244, 72 S.E.2d 241.   *See also Wicks v. City*

*of Charlottesville,* 215 Va. 274, 208 S.E.2d 752, 754 (1974) (holding that a statute must be construed in conformity with the common law, which required that the indecent exposure occur in front of at least one person, or in a place where it is likely to be seen by at least one person); *State v. King,* 268 N.C. 711, 151 S.E.2d 566, 567 (1966) (stating that at common law indecent exposure did not require actual observation by members of the public when persons were present who could have seen the act); *Commonwealth v. Hamilton,* 237 Ky. 682, 36 S.W.2d 342, 342–43 (1931) (vacating a conviction where indictment failed to charge "that the exposure took place under such circumstances that the members of the public might have witnessed it" because the "exposure may have taken place where the public may not have observed it").

The third and final element of the offense of indecent exposure, the gravamen of the present case, relates to the location of the exposure, oftentimes referred to as the "public place" element. There certainly is no shortage of case law in which the courts have held that this requirement is met when the conduct occurs outside of a dwelling. *See Regina v. Thallman,* LE. & CA. 326 (1863) (affirming conviction for indecent exposure when defendant stood on the roof top of a private home and exposed himself); *Martin,* 101 N.W. at 637 (affirming conviction for indecent exposure occurring on a public highway); *Goldstein,* 62 A. at 1007 (holding that exposure occurred in a public place when defendant exposed himself in his grocery store, a place where "the public is invited for the purpose of trading"); *State v. Rocker,* 52 Haw. 336, 475 P.2d 684, 688 (1970) (holding that individuals bathing in the nude on a public beach had committed the offense of indecent exposure); *Wicks,* 208 S.E.2d at 754 (affirming conviction where defendant urinated while walking down the sidewalk in town).

In the instant case, however, we are confronted with lewd conduct that occurred inside a private dwelling, raising the question of whether exposure in such a place can satisfy the "public" element of the offense of indecent exposure. When confronted with the same issue of whether to criminalize an

indecent exposure in a private dwelling, courts of our sister states have divided. For some, the classification of the location as "private" is dispositive, as Wisneski asserts. Courts in Indiana and New Mexico, for example, interpreting statutes, have held that an indecent exposure occurring inside a private dwelling was not subject to criminal penalties. *See Long v. State,* 666 N.E.2d 1258, 1261 (Ind.App.1996) (holding that, although "a private residence or private club is not a public place," the members-only strip club was a public place because membership only cost one dollar and therefore it was open to the public without restraint); *State v. Romero,* 103 N.M. 532, 710 P.2d 99, 103 (1985) (conviction for indecent exposure in private residence before two children reversed where "[i]t [wa]s undisputed that the acts of defendant upon which the state relied to establish the convictions of indecent exposure occurred within the confines of a private residence ... [and] were not subject to being viewed by the public generally," meaning they were not "perpetrated in a place accessible or visible to the general public"). *But see United States v. Graham,* 56 M.J. 266, 269 (U.S.A.F.2002) ("At the onset, we note that *Romero* represents the minority view, which we generally decline to follow. More importantly, however, we are unpersuaded by its logic.").

The majority of state courts, though, have concluded that an indecent exposure may be criminalized if it occurs in a private dwelling, either when interpreting a common law offense or a statute.[9] Some have held that the "public" nature of the

---

9. We have included cases addressing the locational aspect in light of statutes that include a "public" element, as adverse to those statutes that do not include such an element, such as those found in Colorado (Colorado Revised Statutes (2004), § 18–7–302 requires the exposure be "in the view of any person"); Michigan (Michigan Compiled Laws (2004), § 750.33 prohibiting persons from making "any open or indecent exposure"); and Washington (Washington Revised Code (2006), § 9A.88.010 also requiring only an "open and obscene exposure"). The "public" element at common law equates to the "public" element in statutes. *See Moses v. Commonwealth,* 45 Va.App. 357, 611 S.E.2d 607, 613 (2005) (indecent exposure statute "is a codification of the common law"); *Duvallon v. District of Columbia,* 515 A.2d 724, 725–26 (D.C. 1986) ("[T]he indecent exposure clause ... was a codification of the

offense of indecent exposure is met when the defendant's indecent exposure occurs in front of an unobstructed window inside of a private dwelling. *See Legel,* 321 N.E.2d at 166 (holding that defendant indecently exposed himself in his own home by standing on top of his dining room table, under a light fixture, at night, and in clear view of the neighboring home through unobstructed sliding glass doors); *State v. Odom,* 554 So.2d 1281, 1284 (La.Ct.App.1989) (upholding conviction of defendant for obscenity for standing inside his home in front of an exposed window and knocking on it to attract the attention of the neighboring children); *Commonwealth v. Bishop,* 296 Mass. 459, 6 N.E.2d 369, 370 (1937) (affirming conviction of defendant for indecently exposing himself in his own home, visible by his neighbor through a window, holding that the public place element was satisfied because it was " 'an intentional act of lewd exposure, offensive to one or more persons' ").

Many also have determined that the behavior can be criminalized even when it is not visible from the exterior of the home. For example, in *McGee v. State,* 165 Ga.App. 423, 299 S.E.2d 573 (1983), the defendant exposed himself to a woman in her apartment and challenged his conviction for public indecent exposure on the ground that it had not occurred in a "public place," as the statutory offense required. The court disagreed, explaining that "public place," for purposes of the crime of indecent exposure, was statutorily defined as " 'any place where the conduct involved may reasonably be expected to be viewed by people other than members of the actor's family or household.' " *Id.* at 575. Thus, the court determined that the victim's apartment constituted a "public place" when the defendant exposed himself therein, knowing that his conduct would be observed by an individual who was not a member of his family or household. *Id.*

---

common law crime of indecent exposure."); *State v. King,* 285 N.C. 305, 204 S.E.2d 667, 669 (1974) (" 'The [North Carolina] indecent exposure statute ... is simply a codification of the common law crime' ").

Building on *McGee*, the same court in *Greene*, 381 S.E.2d at 310, affirmed another conviction for public indecent exposure when the defendant indecently exposed himself to his children's babysitter and the babysitter's two younger siblings and a friend in his own home. In holding that Greene's home satisfied the "public place" element of the statutory offense, the court explained that:

> Greene by his own behavior removed the barrier and converted his bedroom and bath from a private zone to a public place, where his nudity might reasonably be expected to be viewed by people other than members of his family or household. It is not necessary that the place be visible to members of the public who are outside of it.

*Id.* at 311.

In *State v. Whitaker*, 164 Ariz. 359, 793 P.2d 116 (1990), the defendant was charged with indecent exposure, the governing statute for which provided:

> A person commits public sexual indecency by intentionally or knowingly engaging in any of the following acts, if another person is present, and the defendant is reckless about whether such other person, as a reasonable person, would be offended or alarmed by the act.

*Id.* at 117 n. 1, quoting Ariz.Rev.Stat. Ann. Section 13–403 (1983), for exposing himself to his *own two daughters,* as well as two other undisclosed females, in different locations throughout his home. The court explained that 13–403 closely tracked 13–402, the Arizona statute on Indecent Exposure, which provided:

> A person commits indecent exposure if he or she exposes his or her genitals or anus or she exposes the areola or nipple of her breast or breasts and another person is present, and the defendant is reckless about whether such other person, as a reasonable person, would be offended or alarmed by the act.

*Id.* at 118 n. 3, quoting Ariz.Rev.Stat. Ann. Section 13–402. Noting that the Legislature defined the crime as "public" indecent exposure, the court explained that a "public" indecent

exposure is one that occurs in a "a place where the actor might reasonably expect his conduct to be viewed by another," and thus, "the statute's proscriptions can be committed in one's own home." *Id.* at 319, 320, 793 P.2d 116. *See also People v. Randall,* 711 P.2d 689, 695 (Colo.1985) (affirming conviction of defendant for public indecency where defendant exposed himself to an eleven-year old boy while inside a client's home).

We are persuaded by the logic of the majority of the courts in our sister states that an indecent exposure within a private dwelling may suffice. As explored in *Messina,* the issue is primarily one of whether the defendant's behavior was done in secret or in a place observed or capable of being observed: "[t]he place where the offense is committed is a public one if the exposure be such that it is likely to be seen by a number of casual observers." *Id.* at 605, 130 A.2d at 579–80. The Court of Special Appeals determined in the instant case that Wisneski had "publicly" exposed himself and recognized that the public exposure element can be satisfied in places other than those physically located outdoors or open to the public at large. The intermediate appellate court relied upon factors such as whether the observers in the case were members of Wisneski's household or family, or whether they had consented to the exposure, as have some of our sister states, especially Georgia.

Our jurisprudence, however, in *Messina* defines an exposure as public if "the act it is seen or likely to be seen by *casual* observers." *Messina,* 212 Md. at 605, 130 A.2d at 579–80. Casual is defined as "not expected, foreseen, or planned." Black's Law Dictionary 231 (8th ed.2004). It is something that occurs without regularity. Merriam–Webster's Collegiate Dictionary 193 (11th ed.2003). With respect to a person, it is an individual who, at best, is known only superficially. *Id.* Casual observer in the context of the crime of indecent exposure, then, is one who observes the defendant's acts unexpectedly. Clearly, the circumstances of any case dictate whether the indecent exposure was something to be expected, foreseen, or planned: persons frequenting places of licit public

nudity may expect to see naked bodies, while individuals visiting a private home may not, for example.

██  Therefore, we believe that under a reasoned approach, and based upon our jurisprudence, as limited as it may be, the common law offense of indecent exposure requires wilfulness and observation by one or more casual observers who did not expect, plan or foresee the exposure and who were offended by it. This definition of "public" not only incorporates and reflects the historical antecedents from England for criminalizing the offense, as enunciated by Sir William Blackstone, to prohibit unexpected offensive conduct, but it also compliments the "public" nature of all of the elements of indecent exposure.

Nevertheless, Wisneski contends that, at common law, an indecent exposure occurring inside of a dwelling must have been visible to passers-by outside in order to satisfy the "public" element of the offense, and cites *Webb*, 1 Den. at 338. In *Webb*, a barmaid, while working in a public house, observed the defendant expose himself while standing between the entrance to the house and the entrance to the bar. Although the location of the defendant's exposure was such that anyone passing by could have seen him, it was not established at trial that anyone had seen him, other than the barmaid. In vacating the defendant's conviction for indecent exposure, the court held that the public element of the crime had not been satisfied because the exposure only had been observed by one person. *Id.* at 345. We did not find this line of reasoning persuasive in *Messina*, however, because the number of persons witnessing an indecent exposure is not dispositive, so long as it occurs in a such a place that is likely to be observed by a casual observer. *Messina*, 212 Md. at 605, 130 A.2d at 579–80.[10]

---

**10.** Wisneski also cites *Karo*, 468 U.S. at 705, 104 S.Ct. at 3296, 82 L.Ed.2d at 530, and *Kyllo*, 533 U.S. at 27, 121 S.Ct. at 2038, 150 L.Ed.2d at 94, in support of his argument that a person's home constitutes a "private," and not "public," place, and therefore does not satisfy the "public" element of the crime of indecent exposure. The Appellate Court of Illinois rejected a similar argument in *Legel*, 321 N.E.2d at 164, when it stated:

Wisneski also urges this Court to adopt the definition of a "public place" as one "that is for the time being open to a portion of the public, as distinguished from a private room," set forth by the Georgia Court of Appeals in *Byous*, 175 S.E.2d at 106, which he alleges derives from the common law. In *Byous*, the defendant was convicted of indecent exposure for standing in front of a window inside of his home, visible to children getting on and off the school bus. The defendant challenged his conviction on the ground that he was not in a "public place" when he exposed himself. The definition of public place recited by the court, however, was not derived from common law, as Wisneski contends; the definition constituted the court's interpretation of the "public" element of the then statutory offense of indecent exposure. *Id.* at 107. The court went on to explain that the definition, "[t]aken literally ... supports the contention of the appellant that what one does in the privacy of his own home cannot ... be subjected to public scrutiny." *Id.* at 108. Nevertheless, the court affirmed the defendant's conviction, reasoning that,

> if the defendant deliberately disregards the protection of his walls and makes use of their windows instead to make such conduct public, his own act and not that of the State deprive him of the protection that otherwise surrounds him.

*Id.* at 107. Thus, the court in Byous relied upon the fact that the defendant's conduct was visible to persons outside of the

---

Defendant maintains that his home is his castle and that therefore activities within the confines of his walls are private. This is a nonsequitur. It is true that a person's home is protected by law from intrusion by trespassers, but activities within the confines of one's home are protected *only to the extent that the individual seeks to preserve his activities as private.* "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." (*Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576, 582 (1967).) Such is the present case. The facts, as related, clearly show that defendant made no attempt to preserve his activities as private. A reasonable man in the position of the defendant would expect his conduct to be viewed by others....

*Id.* at 168 (emphasis added). Likewise, in the case before us, Wisneski made no effort to keep his actions private when he intentionally exhibited his genitalia to others.

house in deriving its conclusion that the public element of the statutory offense had been met. Since the time of this holding in *Byous,* however, the term "public place" has been statutorily defined to mean "any place where the conduct involved may reasonably be expected to be viewed by people other than members of the actor's family or household," *McGee,* 299 S.E.2d at 575, which, as demonstrated by the Georgia Courts' holdings in *McGee* and *Greene,* is akin to our definition of the "public" element of the offense of indecent exposure in that the determining factor is not the actual locale of the conduct, but rather the circumstances of the observation, as iterated in *Messina'*s definition of "public" as anywhere that a reasonable man knows or should know that his act will be open to the observation of others. 212 Md. at 606, 130 A.2d at 579.

We hold that the evidence was sufficient in the case *sub judice* for the trier of fact to find, beyond a reasonable doubt, that Wisneski's conduct satisfied all three elements of the offense of indecent exposure. Testimony at trial established that he was standing in proximity to three persons at the time that he exposed himself, and that he repeatedly shook his genitalia at one of them, while adamantly and repeatedly asking her if she was "on her period." Wisneski's indecent exposure was wilful and deliberate and subject to actual observation by two of the people, one who became enraged while the other turned away. Both reactions reflect that the two of them were casual observers to Wisneski's exhibition and were offended by it, thereby establishing that Wisneski "publicly" indecently exposed himself.

### JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED, WITH COSTS.

BELL, C.J. and GREENE, J. dissent.

Dissenting Opinion by GREENE, J., which BELL, C.J., Joins.

Respectfully, I dissent.

The majority concludes that the evidence was sufficient in the case *sub judice* for the trier of fact to convict Petitioner of

all three elements of the common law crime of indecent exposure—intent to expose, an actual exposure in public, and an exposure that is, or is likely to be, observed by others. (Maj. op. at 603–04, 921 A.2d at 288–89); *see Messina v. State,* 212 Md. 602, 606, 130 A.2d 578, 580 (1957). I agree with the majority that Petitioner's intent to expose himself was willful and deliberate and that his exposure was observed by other individuals. I disagree, however, that Petitioner's exposure to individuals located inside a private residence constitutes a "public" exposure under the common law offense of indecent exposure.

As the majority sets forth, the crime of indecent exposure in Maryland is a common law offense derived originally from the English Common law. (Maj. op. at 589–90, 921 A.2d at 280). Sir William Blackstone explained that indecent exposure is a crime against religion and morality that requires "open and notorious lewdness." 4 Commentaries on the Laws of England 41, 65 (6th ed. 1775). In 1897, Lewis Hochheimer stated that the crime of "Indecent exposure of person" consists of:

> [E]xposure in public of the entire person, or of parts that cannot properly be exhibited in public.[ ] An exposure is said to be "public," or in a "public place," if it occurs under such circumstances as to render it probable, that it would be seen by a number of persons, it being immaterial that it was not actually seen by any one.[ ]

Lewis Hochheimer, *The Law of Crimes and Criminal Procedure* 453 (1897).

*Messina v. State,* 212 Md. 602, 130 A.2d 578, is the leading case on this issue. In *Messina,* two thirteen year-old girls were walking along Northern Parkway in Baltimore when one of the girls noticed Messina sitting in his car. *Messina,* 212 Md. at 604, 130 A.2d at 579. According to one of the girls, Messina gave her a funny look and then exposed himself. The State charged him with indecent exposure. He argued that because only one girl saw him, the exposure was not public. We stated that:

> The place where the offense is committed is a public one if the exposure be such that it is likely to be seen by a number of casual observers.
>
>        \*      \*      \*      \*      \*      \*
>
> An exposure is "public," or in a "public place," if it occurs under such circumstances that it could be seen by a number of persons, if they were present and happened to look.
>
>        \*      \*      \*      \*      \*      \*
>
> An exposure becomes indecent, and a crime, when defendant exposes himself at such a time and place that, as a reasonable man, he knows or should know his act will be open to the observation of others.

*Messina*, 212 Md. at 605–06, 130 A.2d at 579–80 (citations omitted). We then determined that because Messina "could have been seen by anyone who happened to walk or drive by on the busy street where it was taking place[,] [u]nder those circumstances, it amounted to an offense against public decency." *Messina*, 212 Md. at 606, 130 A.2d at 580.

The majority bases its holding, in large part, upon this language of *Messina*. It also examined the plain meaning of the term "casual," and found it to mean "not expected, foreseen, or planned." (Maj. op. at 601, 921 A.2d at 287) (*citing* Black's Law Dictionary 231 (8th ed.2004)). The majority concludes that a "[c]asual observer in the context of the crime of indecent exposure, then, is one who observes the defendant's acts unexpectedly." (Maj. op. at 601, 921 A.2d at 287). The majority holds, therefore, that because the visitors of the home in which Wisneski exposed himself did not expect to see Wisneski's genitalia, they were casual observers and the home became a public place. I disagree with this interpretation of the phrase, "casual observer" and with such an expansion of the common law; we have never considered a private home to be a public place in the context of indecent exposure and such an extension of the concept is not warranted here.

Based on our reasoning in *Messina*, a casual observer is an individual who happens upon a defendant in the midst o f his or her indecent exposure such that the confrontation with that

individual is "not expected, foreseen, or planned," like the situation involving the teenager who happened to walk by Messina while he was exposing himself in his car. We have never concluded that a casual observer is an individual with whom a person has spent an afternoon inside a private dwelling who then happens to act in an unexpected manner.

Messina was convicted of indecent exposure because a teenager saw him expose himself on a busy street and we stated explicitly that the exposure was public because Messina "could have been seen *by anyone who happened to walk or drive by* on the busy street where it was taking place[,] *[u]nder those circumstances*, it amounted to an offense against public decency." *Messina*, 212 Md. at 606, 130 A.2d at 580 (emphasis added). The majority takes the language of *Messina* out of context and, in doing so, expands the common law beyond its intended boundaries. *Messina* dealt solely with a man who exposed himself on a busy, public street in Baltimore. The majority draws from the dicta in *Messina* and applies it to events that occurred inside a private home.

In my view, the other individuals who were present when Wisneski exposed his private parts were not casual observers and Wisneski's exposure inside the private dwelling did not convert the private home into a public place. He did not expose himself to any individuals other than those inside the home. Based on *Messina* and the definition of "casual," listed *supra*, a casual observer would have to be one who happened to walk or drive by and see Wisneski. There was no evidence that Wisneski exposed himself in front of a large window or open door so that passers-by would see his exposure. Because Wisneski exposed himself in the living room of a private home, in which there were only invited guests, there were no casual observers who could have seen the exposure of his private parts. Under these circumstances, the private home in which Wisneski exposed himself does not constitute a public place consistent with the common law offense of indecent exposure.

In addition, the majority notes that the courts of our sister states are divided on the issue of whether exposure in a private dwelling can satisfy the "public" element of indecent exposure, but that the majority of states hold that indecent exposure may be criminalized in private dwellings. Essentially, all of the cases upon which the majority relies as support for its conclusion, however, are distinguishable from the case *sub judice*. While the cases that the majority cites support a conviction for indecent exposure in a private place, almost all of those cases are based upon the common law offense as modified by statute. The courts in those cases, therefore, interpreted the language of the applicable statutes and analyzed the defendants' behavior under the relevant statutory provisions. *See, e.g., State v. Whitaker*, 164 Ariz. 359, 793 P.2d 116 (1990); *Greene v. State*, 191 Ga.App. 149, 381 S.E.2d 310 (1989); *People v. Randall*, 711 P.2d 689 (Colo.1985); *State v. Odom*, 554 So.2d 1281 (La.App.1989); *McGee v. State*, 165 Ga.App. 423, 299 S.E.2d 573 (1983); *People v. Legel*, 24 Ill.App.3d 554, 321 N.E.2d 164 (1974). As explained above, the crime of indecent exposure is a common law offense in Maryland, and is one that neither the General Assembly nor this Court has modified [1] until today.

As to states that have found a private home to be a public place based solely on the common law crime of indecent exposure, similarly, those cases are distinguishable from the present case as well. For example, in *Commonwealth v. Bishop*, 296 Mass. 459, 6 N.E.2d 369, 370 (1937), the court affirmed the conviction of a defendant for indecently exposing himself in his own home. The court determined that the public place element of the crime was satisfied. In that case, however, the defendant did not expose himself to someone who was within the confines of his private dwelling. Instead, he exposed himself in a room that was visible from his

---

1. As the majority explained, the General Assembly did codify one aspect of the common law offense of indecent exposure in 1902. The General Assembly repealed that provision, however, in 1977 and therefore revitalized the crime of indecent exposure as a common law offense. (Maj. op. at 591, n. 7, 921 A.2d at 281, n. 7).

neighbor's window with the intention of having his neighbor see him. To get his neighbor's attention, he "flash[ed] a mirror" that caused rays of light to form on the neighbor's walls. *Bishop*, 6 N.E.2d at 369. *Bishop* is distinguishable from the case *sub judice* because Mr. Bishop eliminated the essence of privacy from his dwelling by intentionally exposing himself in a manner that was visible to individuals outside of the private residence. In the case *sub judice*, Petitioner exposed himself only to those individuals inside the house and did not demonstrate any intent to expose himself to those on the outside. He did not walk up to a window and deliberately attract attention so that any number of individuals, passers-by, or other "casual observers" would see him. Thus, Petitioner did not change the character of the place from private to public.

The majority's holding creates a slippery slope. Holding that a private home can constitute a public place and that a casual observer is simply one who was not expecting to see what he or she saw expands the common law beyond its intended bounds; especially since indecent exposure is a general intent crime. In addition, my concern is that the majority's holding in this case will require courts, when applying the law of indecent exposure, to draw distinctions based upon different areas of the home, in effect, creating public zones within a private dwelling. Surely, this will create a trap for the unwary. For example, if a woman holds a bachelorette party at her home and pays for an exotic dancer to perform, but one of the guests was not aware that a dancer would be performing and is offended by the male dancer's behavior, then the dancer would be guilty of indecent exposure and the host would be complicit in that crime. Even more offensive, if a man and his fiancé are undressed in their bedroom with the door slightly ajar, and a friend of either occupant walks in and observes the individuals nude, the nude occupants of that room would be guilty of indecent exposure pursuant to the majority's definition of a "casual observer."

The General Assembly has the ability to study and modify the common law as to the crime of indecent exposure, and, in

doing so, can expand the concept of a public place, just as other jurisdictions throughout this country have done. *See, e.g., State v. Whitaker,* 164 Ariz. 359, 793 P.2d 116 (1990); *Greene v. State,* 191 Ga.App. 149, 381 S.E.2d 310 (1989); *People v. Randall,* 711 P.2d 689 (Colo.1985); *State v. Odom,* 554 So.2d 1281 (La.App.1989); *McGee v. State,* 165 Ga.App. 423, 299 S.E.2d 573 (1983); *People v. Legel,* 24 Ill.App.3d 554, 321 N.E.2d 164 (1974). Under those circumstances, the General Assembly would have spoken and expanded the common law to embrace the conduct of Wisneski in this case. Until it does so, however, we are bound by the common law. Of course, this Court has the ability to expand the common law where there is good reason to do so, but, consistent with the underlying purpose of the law. The underlying purpose of the crime of indecent exposure was to proscribe acts of indecency and immorality that occurred in a public place. To the contrary, the common law was not designed to proscribe indecent and immoral acts that occurred inside a private residence.

Wisneski intentionally exposed his genitalia to others while he was inside a private residence. He did not expose himself to anyone outside the residence. Therefore, his actions did not change the character of the location. The residence remained a private place even though others saw his private parts, or did not see his private parts but could have seen them if they had looked. Accordingly, there is no disagreement with the majority's conclusion that Wisneski's conduct was both lewd and intentional. It has been said that "an ounce of prevention is worth a pound of cure." Thus, homeowners would be better advised to become more selective as to those persons that they choose to invite into their homes, than for this Court to expand the common law to make lewd behavior, such as that demonstrated by Wisneski herein, a crime.

Chief Judge BELL authorizes me to state that he joins the views expressed in this dissent.