43 A.3d 1007

**Daniel GENIES**

v.

**STATE of Maryland.**

**No. 11, Sept. Term, 2011.**

Court of Appeals of Maryland.

May 1, 2012.

Bradford C. Peabody, Asst. Public Defender (Paul B. De-Wolfe, Public Defender, Baltimore, MD), on brief, for petitioner.

Brian S. Kleinbord, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, and Jeremy M. McCoy, Asst. Atty. Gen., Baltimore, MD), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and JOSEPH F. MURPHY, JR.* (Retired, Specially Assigned), JJ.

BATTAGLIA, J.

In this case, we are asked to consider whether the common law offense of indecent exposure is preempted on the facts of

---

\* Murphy, J., participated in the hearing and in the conference of the case in regard to its decision after having been recalled pursuant to the Constitution, Article IV, Section 3A, but did not participate in the adoption of the opinion.

this case by Section 8–803 of the Correctional Services Article, Maryland Code (1999, 2008 Repl.Vol.), which prohibits "[a]n inmate . . . with intent to annoy, abuse, torment, harass, or embarrass a correctional officer or authorized personnel [from] lewdly, lasciviously, and indecently expos[ing] private parts of the inmate's body in the presence of the correctional officer or authorized personnel." [1]

While incarcerated at the Montgomery County Correctional Facility in 2008, Daniel Genies, Petitioner, masturbated in sight of a female correctional officer, while smiling and making eye contact with her, in spite of her orders to stop. Genies was subsequently charged with committing the common law offense of indecent exposure, as well as with violating Section 8–803. Prior to trial in the Circuit Court for Montgomery County, Genies moved to dismiss the common law charge, arguing that Section 8–803 was preemptive. The motion was denied by Judge Joseph A. Dugan, Jr., the presiding judge. The jury subsequently acquitted Genies of the statutory offense but convicted him of the common law offense. Genies, thereafter, filed a motion for new trial, in which he alleged juror intimidation during deliberations, but Judge Dugan denied the motion without a hearing and ultimately sentenced Genies to three years' imprisonment.

The Court of Special Appeals affirmed the conviction in a reported opinion, *Genies v. State,* 196 Md.App. 590, 10 A.3d

---

1. All references to Section 8–803 of the Correctional Services Article ("Section 8–803") throughout are to Maryland Code (1999, 2008 Repl. Vol.). Section 8–803 provides:

 (a) *Definitions.*—Words or phrases in this section that describe the common-law crime of indecent exposure shall retain their judicially determined meanings except to the extent expressly or implicitly changed in this section.

 (b) *Prohibited conduct.*—An inmate may not, with intent to annoy, abuse, torment, harass, or embarrass a correctional officer or authorized personnel, lewdly, lasciviously, and indecently expose private parts of the inmate's body in the presence of the correctional officer or authorized personnel.

 (c) *Penalty.*—An inmate who violates this section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 3 years or a fine not exceeding $1,000 or both.

854 (2010), and Genies petitioned this Court for a writ of certiorari, which we granted, 418 Md. 586, 16 A.3d 977 (2011), to consider the following questions:

1. Did the trial court err in failing to dismiss the charge of common law indecent exposure, where the statutory, specific intent crime preempted the field, with respect to indecent exposure by an inmate to a correctional officer?

2. Was it error or an abuse of discretion to deny the motion for new trial, without a hearing?

We shall answer "no" to both questions and shall hold that Section 8–803 did not preempt the common law offense of indecent exposure on these facts and that the trial judge did not abuse his discretion when he ruled, without a hearing, on Genies's motion for a new trial.

 We note at the outset that Genies challenges whether the common law offense of indecent exposure was preempted by the enactment of Section 8–803 in 2002. In his oral argument before this Court, he averred that the common law offense does not apply in a correctional facility,[2] but he does not, however, challenge the evidentiary or legal sufficiency of his conviction for the common law offense of indecent expo-

---

2. In making this argument, Genies relies on language in the legislative history in which the framers of Senate Bill 429 of 2002, from which Section 8–803 was drawn, reflected a concern as to whether the common law offense of indecent exposure, as articulated in the case of *Dill v. State*, 24 Md.App. 695, 332 A.2d 690 (1975), applied in the context of a correctional facility:

Current law defines indecent exposure as the willful and intentional exposure of the private parts of one's body in a public place. However, inmates who expose themselves within the confines of a correctional facility cannot be charged with indecent exposure because correctional facilities are not open to the general public and, therefore, do not fall into the definition of public place.

Senators Jimeno, DeGrange, and Neall, Memorandum, *SB 429 Correctional Services—Inmates—Indecent Exposure*, March 28, 2002; *see also* Senate Judicial Proceedings Committee Floor Report on Senate Bill 429, at 1 (2002), citing *Dill v. State*, 24 Md.App. 695, 332 A.2d 690 (1975). We need not address the drafters' concern as to whether a correctional facility constitutes a "public place" under the common law based on *Dill*, because that question is not before us as it would relate to the legal sufficiency of Genies's conviction, which was not raised.

sure, defined as "a public exposure, made wilfully and intentionally, as opposed to an inadvertent or accidental one; which was observed, or was likely to have been observed, by one or more persons, as opposed to performed in secret, or hidden from the view of others." *Wisneski v. State,* 398 Md. 578, 593, 921 A.2d 273, 282 (2007). We therefore review the trial court's denial of Genies's motion to dismiss, the gravamen of which involved whether Section 8–803 preempts common law indecent exposure when an inmate is the perpetrator, under a *de novo* standard. *See Glover v. State,* 368 Md. 211, 220, 792 A.2d 1160, 1165 (2002).

We initially consider whether Section 8–803 has preempted the common law by application of the following tenets articulated by Judge Alan M. Wilner in *State v. North,* 356 Md. 308, 311–12, 739 A.2d 33, 34–35 (1999), when, as an active member of this Court, he addressed the concept of preemption in the context of a common law offense and a statutory one:

> [T]he issue before us is one of legislative intent—whether, through its enactment of § 287B, the General Assembly intended to withdraw from the purview of the common law offense of attempt the conduct covered by the new statute. In *Robinson v. State,* 353 Md. 683, 728 A.2d 698 (1999), we held it to be "a generally accepted rule of law that statutes are not presumed to repeal the common law 'further than is expressly declared, and that a statute, made in the affirmative without any negative expressed or implied, does not take away the common law,'" but we also observed that "[w]here a statute and the common law are in conflict, or where a statute deals with an entire subject-matter, the rule is otherwise, and the statute is generally construed as abrogating the common law as to that subject." *Id.* at 693, 728 A.2d at 702–03, quoting, in part, from *Lutz v. State,* 167 Md. 12, 15, 172 A. 354, 356 (1934), quoting, in turn, 25 R.C.L. 1054.

This view, generally disfavoring repeal of the common law by implication, has a long history in Maryland. In *Hooper v. Mayor & C.C. of Balto.,* 12 Md. 464, 475 (1859), we quoted with approval from DWARRIS ON STATUTES at 695 that "it is

not to be presumed that the legislature intended to make any innovation upon the common law, further than the case absolutely required," but that "[t]he law rather infers that the act did *not* intend to make any alteration *other* than what is *specified,* and besides *what has been plainly pronounced.*" (Emphasis in original.) In *Anderson v. State,* 61 Md.App. 436, 449, 487 A.2d 294, 300 (1985), Judge Moylan explained the jurisprudential underpinning for that view, namely, the fact that, by Article 5 of the Declaration of Rights, the common law is Constitutionally guaranteed to the inhabitants of the State. Although that common law may be altered or repealed through statutes duly enacted by the General Assembly, given the Constitutional underpinning, its erosion is not lightly to be implied.

In the present case, the statute at issue is Section 8–803 of the Correctional Services Article, which provides:

(a) *Definitions.*—Words or phrases in this section that describe the common-law crime of indecent exposure shall retain their judicially determined meanings except to the extent expressly or implicitly changed in this section.

(b) *Prohibited conduct.*—An inmate may not, with intent to annoy, abuse, torment, harass, or embarrass a correctional officer or authorized personnel, lewdly, lasciviously, and indecently expose private parts of the inmate's body in the presence of the correctional officer or authorized personnel.

(c) *Penalty.*—An inmate who violates this section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 3 years or a fine not exceeding $1,000 or both.

Clearly, the express language of Section 8–803(a) embraces, rather than preempts, the common law crime of indecent exposure, because "words or phrases" describing the crime retain their judicially-determined meanings, unless altered in the Section.

■ Repeal of the common law by implication, then, is the issue. The presumption against such repeal may be overcome, generally, when the statute either addresses the entire

subject matter, known as field preemption, or is inconsistent with the common law, known as conflict preemption. Field preemption is implicated when an entire body of law is occupied on a comprehensive basis by a statute. *Robinson v. State,* 353 Md. 683, 728 A.2d 698 (1999). In *Robinson,* we held that the assault statutes enacted in 1996, Sections 12, 12A, and 12A–1 of Article 27, Maryland Code (1957, 1996 Repl.Code), preempted the common law offenses of assault and battery entirely. While the statutes did not expressly abrogate the common law offenses, their legislative history included bill analyses and a floor report, which stated that the statutes would consolidate and replace the common law offenses. We concluded that this legislative history, coupled with the statute's expressed repeal of the entire existing statutory scheme, indicated that "[t]he new statutes thus subsumed all previous statutory assault provisions as well as the common law into a single scheme and established a two-tired regimen." 353 Md. at 694, 728 A.2d at 703.

Conflict preemption is implicated when a statute repeals the common law "to the extent of inconsistency." *Lutz v. State,* 167 Md. 12, 15, 172 A. 354, 356 (1934). We considered conflict preemption in *North,* specifically whether the crime of attempted possession of a controlled dangerous substance was "narrowed" by Section 287B of Article 27, Maryland Code (1991), which criminalized the possession or purchase of "look alike drugs," or non-controlled substance that the person reasonably believed to be a controlled substance. We observed that there was no express preemption in the language of the statute or enacting session law and proceeded to review the statute's legislative history, which revealed an intent on the part of the Legislature to create a wholly separate offense, rather than supplanting the crime of attempt at common law.

Although Genies argues that Section 8–803 preempts the field, he points to nothing in its language or legislative history to support the notion that the statute was intended to occupy the entire field of indecent exposure by an inmate. In reality, field preemption could not apply, because Section 8–803 only covers exposures in the presence of "authorized personnel," a

term left undefined, rather than the population of individuals who could be victims of indecent exposure, such as visitors, among others, who are regularly present in correctional facilities.

It appears, however, that Genies's argument embodies notions of both field and conflict preemption in his assertion that Section 8–803 supplants the common law offense of indecent exposure. In his hybrid assertion, Genies contends that the statute's specific intent language, "with intent to annoy, abuse, torment, harass, or embarrass a correctional officer or authorized personnel," was intended to supplant the common law's requirement of a wilful and intentional exposure. Under Genies's interpretation, the introduction of this specific intent language altered the belief that the common law offense of indecent exposure did not apply in a correctional facility. He also asserts, alternatively, that the Legislature intended that the statute's specific intent would narrow the scope of indecent exposures with which an inmate could be charged because the nature of the correctional facility, in which inmates have no privacy, would allow an "unpopular inmate" to be charged under the common law offense for a strip search ordered by a correctional officer. He also contends because the common law and statutory offenses share the same penalty, three years imprisonment and $1,000 fine maximum penalty that Section 8–803 was intended to supersede the common law offense.

In addressing the same arguments,[3] the Court of Special Appeals, however, concluded that Section 8–803 was not intended to supplant the common law, but to supplement it. Our intermediate appellate court, in determining that Section 8–803 did not preempt the common law, was persuaded by the statute's legislative history, including the Floor Report for

---

**3.** The questions before the Court of Special Appeals were:

1. Did the trial court err in failing to dismiss Count One, charging common law indecent exposure?

2. Did the trial court err or abuse its discretion in denying his motion for new trial, without holding a hearing?

196 Md.App. 590, 593, 10 A.3d 854, 855 (2010).

Senate Bill 429, that the Bill was intended to address specific behavior directed towards correctional officers:

"[a]ccording to testimony, this bill is intended to address behavioral problems in the corrections system involving inmates (usually male inmates) who intentionally expose themselves to corrections officers and personnel (often female), creating a hostile working environment for the personnel."

196 Md.App. at 608, 10 A.3d at 865, quoting Senate Judicial Proceedings Committee Floor Report on Senate Bill 429, at 2 (2002). Our colleagues then concluded that the presumption against preemption was not overcome by this specific focus, so that Section 8–803 supplemented the common law offense of indecent exposure in a correctional facility. *Id.* at 611, 10 A.3d at 866–67. We agree.

We also must consider whether the statutory offense coexists with the common law offense or whether it supplants the common law. Like its express language, the legislative history of the statute does not contain any discussion of preempting the common law. Rather, the history is replete with discussion that the statute was intended to specifically criminalize harassment by inmates of correctional officers.

In a prior unenacted iteration of the statute drafted in 2001 as Senate Bill 716, the Legislature sought to penalize inmates for exposing themselves to members of the opposite sex:

(b) An inmate may not willfully and intentionally expose private parts of the inmate's body in the presence of a member of the opposite sex.

The legislative purpose behind SB 716 was to address gender-based harassment by inmates towards female correctional officers:

This bill came as a result of complaints my office received from female corrections officers who have been victims of indecent exposure committed by inmates.

Senator Jimeno, Memorandum, *Senate Bill 716 Correctional Services—Inmates—Indecent Exposure.*

In 2002, SB 716 was substantially revised and reintroduced as SB 429. *See* Senate Judicial Proceedings Committee Floor Report on Senate Bill 429, at 2 (2002). In the Bill, the Legislature criminalized an inmate's exposure with the intent to annoy, abuse, torment, harass, or embarrass a witnessing correctional officer or authorized personnel, removing any gender specification and leaving "authorized personnel" undefined:

> (b) An inmate may not lewdly, lasciviously, and indecently expose private parts of the inmate's body in the presence of a correctional officer or authorized personnel.

While the Legislature refocused the class of protected individuals to include any officer or authorized personnel, the motivation for SB 429 remained similar to that of SB 716, to redress harassment by inmates who would indecently expose themselves to guards and create a "hostile work environment for the personnel":

> According to testimony, this bill is intended to address behavioral problems in the corrections system involving inmates (usually male inmates) who intentionally expose themselves to corrections officers and personnel (often female), creating a hostile working environment for the personnel.

Senate Judicial Proceedings Committee Floor Report on Senate Bill 429, at 2. Testimony before the Judicial Proceedings Committee in the Senate in support of Senate Bill 429 provided a particularly graphic depiction of the exposure that precipitated the bill's enactment:

> We need this legislation to address inmates who, with purpose and intent, directly expose themselves and masturbate in front of Officers in routine performance of their duties; likewise, to address inmates who call for the attention of an Officer so that when she responds, she finds them naked and masturbating, sharing in graphic and vulgar terms what they want to do to her.

*SB 429: Correctional Services—Inmates—Indecent Exposure,* Testimony of Richard J. Baker, Superintendent of the Anne

Arundel County Department of Detention Facilities, before the Senate Judicial Proceedings Committee, Feb. 12, 2002, at 1.

██ The essence of the Legislature's purpose, therefore, was to redress workplace harassment by providing a new offense and deterrent for inmates who indecently exposed themselves in an effort to abuse correctional officers. This unique purpose separates the statutory offense from the common law, which originated as "an offense against morality," *Wisneski v. State*, 398 Md. 578, 590, 921 A.2d 273, 280 (2007), and is a factor to consider in any preemption equation. *See Lutz v. State*, 167 Md. 12, 16, 172 A. 354, 356 (1934) (concluding that a statute, criminalizing the keeping of a bawdy house, did not preempt the common law offense, criminalizing the keeping a disorderly house, where "they were directed to different objects").

██ The statutory specific intent, "to annoy, abuse, torment, harass, or embarrass a correctional officer or authorized personnel," Section 8–803(b), is sufficiently different from the common law general intent explained in *Wisneski*, 398 Md. at 593–94, 921 A.2d at 282. Specific intent, unlike general criminal intent, is "not simply the intent to do an immediate act, but the additional deliberate and conscious purpose or design of accomplishing a very specific and more remote result." *Chow v. State*, 393 Md. 431, 464, 903 A.2d 388, 408 (2006), quoting *Harris v. State*, 353 Md. 596, 608, 728 A.2d 180, 183 (1999). The specific intent renders it separate and distinct from the common law and, thus, supplemental, rather than exclusive. *See Lutz*, 167 Md. at 17, 172 A. at 356 ("Since there is therefore no conflict between the common law and the statute, both prevail."). As a result, the specific intent of Section 8–803(b), coupled with a legislative history describing an intent to protect a particular class of victims rather than preempt the common law offense, establishes that Section 8–803 was intended to serve as a discrete offense, supplementing rather than supplanting the common law, so both prevail.

■ Finally, we turn to Genies's second question inquiring whether the trial judge abused his discretion in denying, without a hearing, Genies's motion for a new trial. In his motion, filed within ten days after the trial concluded, Genies alleged that at the conclusion of the trial, a juror had reported to the Jury Commissioner's Office that she had changed her vote during jury deliberations because she had "felt threatened" by another juror who stated "If you don't change your vote, I will make sure we all stay here for weeks," which undermined his ability to have a fair and impartial trial; he requested a hearing on the motion. In answering Genies's motion, the State responded that "[Defense] counsel does not include in her motion that this one juror felt threatened to return a verdict of Not Guilty, and that because of the behavior of the other juror, changed her vote to Not Guilty on the specific intent charge of Indecent Exposure by Inmate[.]" The trial judge denied Genies's motion without a hearing, and the Court of Special Appeals affirmed, based on Maryland Rule 5–606(b)'s preclusion of jurors from testifying as to the validity of their verdict.

In addressing whether the trial judge abused his discretion in denying the motion without a hearing, we look at Rule 4–331, then entitled "Motions for new trial,"[4] which provided:

(a) **Within ten days of verdict.** On motion of the defendant filed within ten days after a verdict, the court, in the interest of justice, may order a new trial.

\* \* \*

(e) **Disposition.** The court may hold a hearing on any motion filed under this Rule. . . .

It is clear that the holding of a hearing is discretionary, but Genies contends that the impact of a threat of a juror against another "cannot be shown to the satisfaction of the Court,

---

**4.** Rule 4–331 was amended in 2010, following Judge Dugan's denial of Genies's motion for new trial. Among the changes in the 2010 amendment were to add "revisory power" to the Rule's title and to redesignate the Disposition subsection as subsection (f). The language pertinent to this case, however, remains unchanged.

without a hearing."[5] The State responds that, "[a]s Genies was unable to present any competent evidence in support of the alleged jury misconduct at a hearing ... the Court of Special Appeals correctly concluded that the trial court properly exercised its discretion in denying Genies's motion under Rule 4–331(a) without a hearing."

In considering whether a hearing was necessary in this case, we must consider that Rule 5–606(b) prohibits a juror from testifying as to a "statement occurring during the course of jury deliberations" or to "the effect of anything upon that or any other sworn juror's mind or emotions as influencing the sworn juror to assent or dissent from the verdict." Contrary to Genies's assertion, we have often held that "under no circumstances would it be admissible to impeach the juror's own verdict at the hearing of the motion for a new trial." *Williams v. State*, 204 Md. 55, 71, 102 A.2d 714, 722 (1954). The facial allegations of the motion and the State's response violated these norms, to Genies's ultimate detriment, but it is true that the allegations could not have been the subject of a hearing. Judge Dugan acted, then, well-within his discretion when he reviewed and ultimately denied Genies's motion for new trial under Rule 4–331(a) without a hearing.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.**

BELL, C.J., and GREENE, J., dissent.

BELL, C.J., dissenting, in which GREENE, J., joins.

This Court granted certiorari [1] to answer two questions:

---

**5.** Genies appears to couch his challenge in constitutional terms by arguing that his "fundamental right to a fair and impartial jury" has been abridged without any elucidation of bases or authority, which supports our exercise of constitutional avoidance in this case.

**1.** The petitioner, Daniel Genies, an inmate at the Montgomery County Correctional Facility, was charged with indecent exposure, both common law, and pursuant to Maryland Code (1999, 2008 Repl. Vol., 2011 Supp.) § 8–803 of the Correctional Services Article. The "victim" or

1. Did the trial court err in failing to dismiss the charge of common law indecent exposure, where the statutory, specific intent crime preempted the field, with respect to indecent exposure by an inmate to a correctional officer?

2. Was it error or an abuse of discretion to deny the motion for new trial, without a hearing?

The majority answers both questions in the negative. As to the first, it agrees with the trial court and the Court of Special Appeals, *Genies v. State,* 196 Md.App. 590, 615, 10 A.3d 854, 858–69 (2010), that Maryland Code (1999, 2008 Repl.Vol., 2011 Supp.) § 8–803 of the Correctional Services Article,[2] does not preempt the common law offense of indecent exposure. Like the intermediate appellate court, *id.,* 196 Md.App. at 615, 10 A.3d at 869, it also concludes that the trial judge did not abuse his discretion when he denied the petitioner's Motion for New Trial without a hearing. *See Genies v. State of Maryland,* op. at 151–52, 43 A.3d at 1009, 2012 WL 1499819 (2012). I dissent. I believe that § 8–803 does preempt the common law offense of indecent exposure, insofar as it proscribes such an exposure by an inmate to a correctional officer. Furthermore, I also believe that the trial judge erred in deciding the

---

"object" of the exposure was a female correctional officer, in whose presence it occurred. His motion to dismiss the common law count having been denied, pre-trial, he was acquitted of the statutory offense, but convicted of common law indecent exposure. The petitioner's timely filed Motion for New Trial, alleging jury misconduct, and accompanied by a "Request For a Hearing" and memorandum, was denied, after which he was sentenced to three years' imprisonment.

2. Section 8–803 provides:

"(a) *Definitions.*—Words or phrases in this section that describe the common-law crime of indecent exposure shall retain their judicially determined meanings except to the extent expressly or implicitly changed in this section.

"(b) *Prohibited conduct.*—An inmate may not, with intent to annoy, abuse, torment, harass, or embarrass a correctional officer or authorized personnel, lewdly, lasciviously, and indecently expose private parts of the inmate's body in the presence of the correctional officer or authorized personnel.

"(c) *Penalty.*—An inmate who violates this section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 3 years or a fine not exceeding $1,000 or both."

petitioner's Motion for New Trial without a hearing; with the petitioner's fundamental right to a fair trial at stake, and proffered facts that were required to be proven to the satisfaction of the court by evidence, which could only occur at a hearing, the trial court abused its discretion when it did not grant a hearing prior to denying the petitioner's Motion for a New Trial.

### *Preemption*

As he did at trial and in the Court of Special Appeals, the petitioner argues that enactment by the General Assembly of a specific intent crime, proscribing "indecent exposure by an inmate to a correctional officer," as to that conduct and circumstance, preempted the field. Thus, he submits, the trial court erred "in failing to dismiss the charge of common law indecent exposure." Resolution of the question presented and the arguments in support are controlled by principles articulated by this Court in *State v. North,* 356 Md. 308, 739 A.2d 33 (1999). There, we stated that, whether a statute preempts the common law is a question that is answered by legislative intent, that is, by reference to whether "the General Assembly intended to withdraw from the purview of the common law offense ... the conduct covered by the new statute." *Id.,* 356 Md. at 311, 739 A.2d at 34. We also have explained that "statutes are not presumed to repeal the common law 'further than is expressly declared, and that a statute, made in the affirmative without any negative expressed or implied, does not take away the common law,'" and also, that "[w]here a statute and the common law are in conflict, or where a statute deals with an entire subject-matter, the rule is otherwise, and the statute is generally construed as abrogating the common law *as to that subject.*" *Robinson v. State,* 353 Md. 683, 693, 728 A.2d 698, 702–03 (1999), quoting *Lutz v. State,* 167 Md. 12, 15, 172 A. 354, 356 (1934) (emphasis added).

Acknowledging and consistent with the teachings of *North,* the majority looks, first, to the express language of § 8–803. *Genies,* op. at 154–55, 43 A.3d 1010–11. As a result, it concludes that § 8–803 "embraces, rather than preempts, the

common law crime of indecent exposure, because 'words or phrases' describing the crime retain their judicially-determined meanings, unless altered in the Section." *Id.* at 154, 43 A.3d at 1010. Thus, it determines that § 8–803 did not expressly preempt the common law crime of indecent exposure. *Id.* at 154–55, 43 A.3d at 1010–11. The majority then focuses on whether the common law offense is preempted by implication. *Id.* at 154–55, 43 A.3d at 1010–11. In that regard, it recognizes that "[a]lthough [the] common law may be altered or repealed through statutes duly enacted by the General Assembly, given the Constitutional underpinning, its erosion is not lightly to be implied." *North,* 356 Md. at 312, 739 A.2d at 35. The majority also acknowledges that the presumption against repeal of the common law by statute "may be overcome, generally, when the statute either addresses the entire subject matter, known as field preemption, or is inconsistent with the common law, known as conflict preemption." *Genies,* op. at 154–55, 43 A.3d at 1010. Each of these prongs it addresses in turn.

With regard to field preemption, the majority adopts the analysis we announced in *Robinson v. State,* 353 Md. 683, 728 A.2d 698: the proper inquiry is whether the "entire body of law is occupied on a comprehensive basis" by the statute at issue, here, § 8–803. *Id.* at 155, 43 A.3d at 1011. It concludes that the petitioner's field preemption argument is unpersuasive, reasoning that "nothing in [§ 8–803's] language or legislative history ... support[s] the notion that the statute was intended to occupy *the entire field of indecent exposure by an inmate.*" *Id.* at 155, 43 A.3d at 1011 (emphasis added). Interestingly and more particularly, the majority concludes that "field preemption could not apply, because Section 8–803 only covers exposures in the presence of 'authorized personnel,' a term left undefined, rather than the population of individuals who could be victims of indecent exposure, such as visitors, among others, who are regularly present in correctional facilities." *Id.* at 155–56, 43 A.3d at 1011.

Turning to the conflict preemption prong,[3] the majority looks to the legislative history of § 8–803. Noting that the Floor Report for Senate Bill 429 indicates that the "bill is intended to address behavioral problems in the corrections system involving inmates (usually male inmates) who intentionally expose themselves to correctional officers and personnel (often female), creating a hostile work environment for the personnel," *id.* at 157, 43 A.3d at 1012, quoting the opinion of the Court of Special Appeals, *Genies,* 196 Md.App. at 608, 10 A.3d at 865, in turn quoting Senate Judicial Proceedings Committee Floor Report on Senate Bill 429, at 2 (2002), it reasons that "the presumption against preemption was not overcome by this specific focus, so that Section 8–803 supplemented the common law offense of indecent exposure in a correctional facility." *Genies,* op. at 157, 43 A.3d at 1012. The majority, therefore, concludes that "[t]he essence of the Legislature's purpose ... was to redress workplace harassment by providing a new offense and deterrent for inmates who indecently exposed themselves in an effort to abuse correctional officers," and further, that "[t]his unique purpose separates the statutory offense from the common law, which

3. The petitioner argued in this Court that § 8–803's specific intent language, requiring that the indecent exposure be for the purpose of "annoy[ing], abus[ing], torment[ing], harass[ing], or embarrass[ing] a correctional officer or authorized personnel," was intended to replace the common law requirement of willful and intentional exposure. *Id.* at 156, 43 A.3d at 1011. That, according to the petitioner, "altered the belief that the common law offense of indecent exposure did not apply in a correctional facility," and evinces the Legislature's intent "that the statute's specific intent would narrow the scope of indecent exposures with which an inmate could be charged because the nature of the correctional facility, in which inmates have no privacy, would allow an 'unpopular inmate' to be charged under the common law offense for a strip search ordered by a correctional officer." *Id.* at 156, 43 A.3d at 1011. The petitioner also points to the fact that both the common law and the statutory offenses impose an identical penalty, a maximum of three years imprisonment and a $1,000 fine, as indicative of the intent for § 8–803 to preempt the common law offense. *Id.* at 155–56, 43 A.3d at 1011. The majority interprets these arguments as conflict preemption arguments, to which its pronouncements respond. As will be made clear, *infra,* that is not my interpretation.

originated as 'an offense against morality.' " *Id.* at 159, 43 A.3d at 1013 (quoting *Wisneski v. State,* 398 Md. 578, 590, 921 A.2d 273, 280 (2007)). According to the majority, the specific intent, which the petitioner argues establishes preemption, instead "renders [§ 8–803] separate and distinct from the common law and, thus, supplemental." *Genies,* op. at 159, 43 A.3d at 1013.

I disagree with the majority's analysis and conclusions regarding preemption. To be clear, I agree with the majority's statement of an essential principle, "[t]he rules of the common law are not to be changed by doubtful implication, nor overturned except by clear and unambiguous language." *Lutz,* 167 Md. at 15, 172 A. at 356. I disagree, and take issue, with the manner in which it applies that principle to the facts of this case. In fact, in my view, the facts of this case, and the legislative history of § 8–803 demonstrate that the statute was intended, clearly and specifically, to preempt that category of common law indecent exposure in which an inmate exposes him or herself, in the correctional setting, to a correctional officer or authorized personnel.

As a threshold matter, the majority misinterprets the question before the Court and, as a result, misperceives, and consequently and not surprisingly, misapplies the relevant preemption analysis. The substantive question as to which we granted certiorari, is, as we have seen:

> "Did the trial court err in failing to dismiss the charge of common law indecent exposure, where the statutory, specific intent crime *preempted the field, with respect to indecent exposure by an inmate to a correctional officer?* "

(Emphasis added). This question is a narrow question. It does not challenge the continued viability of common law indecent exposure as a general matter, just an aspect or category of it. The limited issue it raises is whether § 8–803 preempts that "field" of the common law offense of indecent exposure that occurs in a correctional institution and involves an inmate's indecent exposure to a correctional officer or

authorized personnel. The majority answers a different, broader question: "whether the common law offense of indecent exposure was preempted by the enactment of Section 8–803 in 2002." *Id.* at 152, 43 A.3d at 1009. As I see it, therefore, the majority's holding, that "Section 8–803 did not preempt the common law offense of indecent exposure," vastly exceeds the scope of the question we are asked to address.

Focusing on the narrow issue presented, whether § 8–803 occupies the field with regard to indecent exposure occurring in an institution and committed by an inmate to a correctional officer, I agree that we are guided by the principles articulated by this Court in *State v. North*, 356 Md. 308, 311–12, 739 A.2d 33, 34–35. In that case, we considered a similar issue, whether the Legislature, by enacting Maryland Code (1957, 1992 Repl.Vol.) Article 27, § 287B, "implicitly repealed, at least to the extent of the overlap, the common law offense of attempting to possess a controlled dangerous substance." *Id.*, 356 Md. at 311, 739 A.2d at 34. Section 287B made it unlawful for a person to possess or purchase a non-controlled substance that the person reasonably believed to be a controlled substance. *Id.* We had previously held, in *Grill v. State*, 337 Md. 91, 97, 651 A.2d 856, 859 (1995), that a person who purchases a substance that he or she believes is a controlled dangerous substance, with the intent to purchase a controlled dangerous substance, but receives, instead, a look-alike item that is not, in fact, a controlled dangerous substance, is guilty of the common law crime of attempting to purchase a controlled dangerous substance. We stated:

> "[T]he issue before us is one of legislative intent—whether, through its enactment of § 278B, the General Assembly intended to withdraw from the purview of the common law offense of attempt the conduct covered by the new statute. In *Robinson v. State*, 353 Md. 683, 728 A.2d 698 (1999), we held it to be 'a generally accepted rule of law that statutes are not presumed to repeal the common law further than is expressly declared, and that a statute, made in the affirmative without any negative expressed or implied, does not

take away the common law,' but we also observed that 'where a statute and the common law are in conflict, or where a statute deals with an entire subject matter, *the rule is otherwise,* and the statute is generally construed as abrogating the common law *as to that subject.*' *Id.* at 693, 728 A.2d at 702–02, quoting, in part, from *Lutz v. State,* 167 Md. 12, 14, 172 A. 354, 356 (1934), quoting, in turn, 25 R.C.L. 1054."

*North,* 356 Md. at 311–12, 739 A.2d at 34–35 (emphasis added) (internal quotation marks omitted). There was, the Court acknowledged, in that case, no express indication, on the face of the statute in question, that the common law was to be preempted. *Id.,* 356 Md. at 313, 739 A.2d at 35. Therefore, we had to determine whether the statute impliedly preempted the common law offense. *Id.* We looked to the legislative intent of the statute, and concluded that it did not evince an objective to limit the reach of the common law by statute, and thus, that the common law offense was not preempted. *Id.,* 356 Md. at 315, 739 A.2d at 36.

We agree with the majority's interpretation of *North,* insofar as it cautions that the presumption against the preemption of a common law offense by statute is not to be inferred lightly. On the other hand, although " 'it is not to be presumed that the legislature intended to make any innovation upon the common law, further than the case absolutely required,' but that 'the law rather infers that the act did not intend to make any alteration other than what is specified, and besides what has been plainly pronounced,' " the presumption may be overcome. *Id.,* 356 Md. at 312, 739 A.2d at 34 (quoting *Hooper v. City of Baltimore,* 12 Md. 464, 475 (1859)). " '[W]here a statute and the common law are in conflict, or where a statute deals with an entire subject-matter, the rule is otherwise, and the statute is generally construed as abrogating the common law as to that subject.' " *Id.,* 356 Md. at 312, 739 A.2d at 34–35 (quoting *Robinson,* 353 Md. at 693, 728 A.2d at 702–03, quoting, in part, from *Lutz,* 167 Md. at 15, 172 A. at 356, quoting, in turn, 25 R.C.L. 1054). Thus, the rule that statutes are not to be interpreted as abrogating the common law is not applicable where it can be demonstrated that the

statute has preempted the field, that is, when "a statute . . . deals with an entire subject-matter." *Lutz,* 167 Md. at 15, 172 A. at 356. Field preemption does not require, as the majority apparently, though erroneously, believes—it defines field preemption as occurring "when an entire *body of law* is occupied on a comprehensive basis by statute," *Genies,* op. at 155, 43 A.3d at 1011—that the statute deal with an entire area of law, or, as is relevant to the case *sub judice,* an entire category of criminal activity. Instead, and as we pointed out in *Robinson,* it is possible for a statute to preempt the common law with regard to a specific subject matter within an area of law, or specific conduct within a category of criminal activity. 353 Md. at 693, 728 A.2d at 702–03. Here, the subject matter within the general area of law, the conduct within a category of criminal activity, is indecent exposure of an inmate to a corrections officer, not indecent exposure, in general.

It is true, as the majority points out, that neither the statute nor the legislative history of § 8–803 contains any indication that the General Assembly, by enacting the statute, expressly preempted the common law crime of indecent exposure. *Genies,* op. at 155–56, 43 A.3d at 1011. That is not the dispositive question where field preemption is concerned, however. Preemption may be *implied;* it need not always be express. *Robinson,* 353 Md. at 693, 728 A.2d at 702–03. When neither the statute nor its legislative history demonstrates that the statute expressly preempts the common law, the critical question is whether the statute deals with, addresses, the entire subject matter. *Id.* If it does, the intent of the Legislature to supplant the common law, *as to that subject,* is implied. The majority recognizes that this is so—that where a statute occupies the field, the presumption against the repeal of the common law by statute is overcome, *Genies,* op. at 154–55, 43 A.3d at 1010–11, and preemption has, indeed, occurred.

The issue with which we are presented is whether "the statutory, specific intent crime (§ 8–803) preempted the field,

with respect to indecent exposure by an inmate to a correctional officer." Stated differently, we have to decide whether § 8–803 deals with and occupies the entire field of indecent exposures occurring between those parties, within the correctional setting. I believe that it does.

Section 8–803(b) provides that "[a]n inmate may not, with intent to annoy, abuse, torment, harass, or embarrass a correctional officer or authorized personnel, lewdly, lasciviously, and indecently expose private parts of the inmate's body in the presence of the correctional officer or authorized personnel." To be sure, it does not purport to address the offense of indecent exposure, in general, in all of its iterations and under all possible circumstances. As to that, I am in total agreement with the majority. *Genies*, op. at 158–59, 43 A.3d at 1012–13. It deals, rather, with a discrete circumstance and with specific parties; the language of the statute makes clear, unambiguously, that it applies only in those situations, in a correctional setting, involving an inmate and a correctional officer or authorized personnel. But it applies in all such situations. Moreover, it is absolutely clear and unambiguous in that regard. As a result, § 8–803, in accordance with the definition in *Lutz*, occupies the field with respect to indecent exposure by an inmate to a correctional officer, in a correctional setting. The majority, thus, answers the wrong question.

My interpretation of § 8–803 as preempting the field of indecent exposure with respect to indecent exposures by an inmate to a corrections officer is confirmed by its legislative history.[4] The Court of Special Appeals, in its opinion, report-

---

4. The majority and the Court of Special Appeals find the text of § 8–803 to be ambiguous, precluding a definitive determination of legislative intent on that basis and, thus, requiring resort to legislative history. The intermediate appellate court, for example, said, on this point, by way of explanation as to why it was necessary to consult legislative history, "[w]hile it is arguable that the Legislature intended such specific conduct to be charged under C.S. § 8–803, it is not clear that the Legislature also intended that other types of indecent exposure by inmates could not be charged." *Genies*, 196 Md.App. at 607, 10 A.3d at 864. I, on the other hand, believe that the statute is clear and

ed the results of its examination of the contents of the legislative bill file with respect to SB 429, the bill, which, after enactment, was codified as § 8–803, its analysis, and the conclusions it drew from that examination. 196 Md.App. at 607–09, 10 A.3d at 864–65. It advised:

> "Based on our examination of [§ 8–803's legislative] history, it appears that a significant factor informing the legislative process was a memorandum opinion issued by the Circuit Court for Anne Arundel County, Maryland. See Testimony of Richard J. Baker, Superintendent of Anne Arundel County Department of Detention Facilities on SB 429 (February 12, 2002). According to written testimony in the history, at some point prior to consideration of the bill that would enact C.S. § 8–803, Senate Bill 429, the Circuit Court had reversed indecent exposure convictions of two inmates 'on the grounds that a correctional facility is not a public place and therefore, the law against indecent exposure does not apply.' *Id.* at 2. Specifically, the Circuit Court had ruled:
>
> > 'Correctional officers have a difficult enough job in keeping themselves and the inmates safe, without having to be subjected to conduct such as expletive-laden communications or vulgar, disgusting and repulsive acts such as the Defendant has repeatedly committed.' [However,] '[a]s much as the Court would like to penalize Defendant for his abhorrent conduct, it may not, as such conduct does not fall within the boundary of the common law offense of indecent exposure.'
>
> *Id.* (further citation omitted).

---

unambiguous as to what it covers. Accordingly, it is not necessary that legislative history be consulted. Nonetheless, it may be consulted, and I do, in order to confirm my interpretation of the statute. *See The Arundel Corp. v. Marie,* 383 Md. 489, 502, 860 A.2d 886, 894 (2004) ("If there is no ambiguity in [a statute's] language, either inherently or by reference to other relevant laws or circumstances . . ., we do not then need to resort to the various, and sometimes inconsistent, external rules of construction, for the Legislature is presumed to have meant what it said and said what it meant," quoting *Toler v. MVA,* 373 Md. 214, 220, 817 A.2d 229, 233 (2003) (internal quotation marks omitted)).

"Apparently in response to the Circuit Court's ruling that a correctional facility was not a 'public place' where the crime of common law indecent exposure could be committed, several legislators proposed Senate Bill 429 in order to make clear that such conduct amounted to criminal behavior. Notably, in a letter from three senators contained within the history is the following:

'[Senate Bill] 429 prohibits inmates from indecently exposing themselves in the presence of correctional officers or authorized personnel. Current law defines indecent exposure as the willful and intentional disclosure of the private parts of one's body in a public place. However, inmates who expose themselves within the confines of a correctional facility cannot be charged with indecent exposure because correctional facilities are not open to the general public and, therefore, do not fall into the definition of a public place.'

"Letter from Senators Jimeno, DeGrange, and Neall re: SB 429 (February 12, 2002).

'Additionally, according to the Floor Report on SB 429, [a]ccording to testimony, this bill is intended to address behavioral problems in the corrections system involving inmates (usually male inmates) who intentionally expose themselves to corrections officers and personnel (often female), creating a hostile working environment for the personnel.'

"Floor Report of the Senate Judicial Proceedings Committee for Senate Bill 429 of 2002."

196 Md.App. at 607–08, 10 A.3d at 864–65.

From this legislative history, the intermediate appellate court concluded:

"The legislative history suggests that the Legislature intended to crystallize that specific conduct by an inmate, i.e., lewd, lascivious, and indecent exposure with a specific intent in the presence of correctional officers or authorized personnel, amounted to a misdemeanor. We cannot conclude,

however, that the Legislature also intended to preempt the common law in this specific area."

196 Md.App. at 609, 10 A.3d at 865. Agreeing, the majority rationalizes that "[t]he essence of the Legislature's purpose ... was to redress workplace harassment by providing a new offense and deterrent for inmates who indecently exposed themselves in an effort to abuse correctional officers. This unique purpose separates the statutory offense from the common law, which originates as 'an offense against morality.'" *Genies*, op. at 159, 43 A.3d at 1013 (quoting *Wisneski v. State*, 398 Md. 578, 590, 921 A.2d 273, 280 (2007)). I disagree.

I have no disagreement with the legislative history on which the majority and the Court of Special Appeals rely. It does shed light on the intent with which § 8–803 was enacted and, indeed, only underscores the conclusion that § 8–803 was intended to occupy the field of indecent exposure by an inmate to a corrections officer. That history demonstrates that the Senate Bill that became § 8–803 was a response to a court decision holding that the common law crime of indecent exposure did not apply in a corrections facility, that because a corrections facility is not a public place, a necessary element of the common law crime, an inmate who indecently exposes him- or herself to a corrections officer was not guilty of common law indecent exposure. The sponsors of the legislation made clear that it was their intention to bridge that gap between the common law and unpunishable "abhorrent conduct," by "prohibit[ing] inmates from indecently exposing themselves in the presence of correctional officers or authorized personnel." Their proposed legislation created just such a crime, which specifically applies to indecent exposures, in correctional facilities, engaged in by inmates and directed to correctional officers and authorized personnel. That is the precise scenario that is at issue in this case. Thus, it is unquestionable that § 8–803 was enacted to *change*, that is, preempt, the common law. Prior to its enactment, inmates who indecently exposed themselves to correctional officers and other authorized personnel, in correctional facilities, would have been subject only

to the common law definition of indecent exposure, which the Circuit Court for Arundel County had ruled did not apply to correctional facilities. After its enactment, those inmates would be chargeable pursuant to the statute and punished.

The majority sees it differently, as we have seen. To be sure, it purports to give effect to the statement of intention of the legislation's sponsors. By attributing to them the purpose of "redress[ing] workplace harassment by providing a new offense and deterrent for inmates who indecently exposed themselves in an effort to abuse correctional officers," *Genies*, op. at 159, 43 A.3d at 1013, the majority is able to characterize the result as an "unique purpose" separate from the moral purpose of the common law crime. *Id.* at 159, 43 A.3d at 1013. With all due respect, this makes no sense. First, the purpose of the statute and how that purpose relates to the common law offense's purpose have no bearing on the question of whether the statute, in fact, occupies the field and preempts the common law. Indeed, requiring such an inquiry adds an additional prong to the preemption test—determining whether the purpose of the statute in question is identical to the purpose or spirit of the common law offense sought to be preempted. This case, second, is exactly the kind of case that § 8–803 was designed to reach.[5] Whether the common law would apply under other circumstances in the correctional

---

**5.** The facts of this case are essentially as follows. The petitioner, while detained in the medical unit of the Montgomery County Correctional Facility, undertook to gain the attention of Corporal N. Goodridge, a female correctional officer who was making her rounds in the vicinity of his room, by knocking, repeatedly, on the window. Though the officer ignored him, he continued to do this, every twenty minutes, as the officer made her scheduled rounds, until he finally got her attention while she and a nurse escorted another inmate through the hallway near his room. The officer saw the petitioner laying in his bed, which was placed against a large glass window and facing the hallway, masturbating, with his penis exposed. Despite her protests and instructions for him to stop, the petitioner continued, more vigorously, while looking at the officer and smiling, until he ejaculated.

The majority correctly notes that who is an "authorized personnel" is undefined, *Genies*, op. at 157–58, 43 A.3d at 1012. A fair point, I can grant; however, it is not debatable that the petitioner was in a medical unit of the correctional facility. A nurse in such a facility, even had she

facility is not presented and, therefore, is beside the point; the petitioner simply was not charged with indecently exposing himself to a visitor or other person, who was not a corrections officer or authorized personnel. While it may have broadened the specific culpable intent with which the inmate must act,[6] contrary to the majority's suggestion, the moral aspect of the common law crime is retained by § 8–803; it proscribes "lewdly, lasciviously, and indecently expos[ing]" the inmate's private parts.[7]

been designated a victim, surely is, common sense would dictate, "authorized personnel."

6. It is not at all clear that the intent element of the statute adds anything to the common law crime except to make express and provable something—the motivation for the action—that the common law assumed. The purpose of indecently exposing oneself in a public place can be assumed to have some purpose. The intents proscribed by § 8–803, "annoy, abuse, torment, harass, or embarrass," are quite broad and may be broad enough to encompass any such purpose.

7. The common law offense of indecent exposure occurs upon the " 'wilful and intentional exposure of the private parts of one's body in a public place in the presence of an assembly.' " *Wisneski v. State*, 398 Md. 578, 591, 921 A.2d 273, 281 (quoting *Dill v. State*, 24 Md.App. 695, 699, 332 A.2d 690, 693 (1975)). Accordingly, at common law, "[a]n exposure becomes indecent, and a crime, when defendant exposes himself at such a time and place that, as a reasonable man, he knows or should know his act will be open to the observation of others." *Id.* (quoting *Dill*, 24 Md.App. at 700, 332 A.2d at 694). Thus, the elements of common law indecent exposure are " 'the willful exposure, the public place in which it was performed, and the presence of persons who saw it.' " *Id.* (quoting *Dill*, 24 Md.App. at 699, 332 A.2d at 693).

Unlike the common law offense, § 8–803 requires that the exposure not only be willful, but accompanied by the specific intent of "annoy[ing], abus[ing], torment[ing], harass[ing], or embarrass[ing] a correctional officer or authorized personnel. Additionally, the exposure, in the presence of the correctional officer or authorized personnel, must be "lewd[ ], lascivious[ ], and indecent[ ]." These enumerated requirements are not incompatible or inconsistent with common law indecent exposure. Indeed, rather than establishing a crime separate and distinct from common law indecent exposure, § 8–803 codifies the moral aspect of the common law offense while, at the same time, requiring proof of the purpose of the conduct and thus, in effect, subsumes it.

There is no question that the petitioner's conduct meets the requirements of § 8–803. He willfully exposed his penis in a place which he reasonably knew would be open to the observation of others; in fact, he

It is evident, both from the language of § 8–803 and the legislative history of the statute, which underscores it, that the Legislature intended that the statute, rather than the common law offense of indecent exposure, apply when an inmate, in a correctional facility, exposes him- or herself in the presence of a correctional officer or other authorized personnel, and that the common law offense is preempted. It follows that, having been acquitted of the statutory offense, the petitioner is entitled to a reversal of his conviction.

### Motion for New Trial

The petitioner also asks us to determine whether the trial court erred when it denied his Motion for New Trial, without a hearing. In moving for new trial, the petitioner relied on information from a juror, who, after his trial had concluded, contacted the Commissioner's Office to report that, during the deliberations, in response to a threat from another juror,[8] she changed her vote. Relying on the prohibition, contained in Rule 5–606(b),[9] of a juror testifying concerning a "statement

---

*wanted* it to be seen, as demonstrated by his knocking on the window to get the attention of the officer. Of more significance, his conduct, masturbation in the presence of a female correctional officer, was lewd, lascivious and indecent. That he purposely sought to gain her attention while so conducting himself demonstrates that he intended to annoy, abuse, torment, harass or embarrass her.

8. In a memorandum in support of the new trial, the petitioner proffered:

"After conclusion of the defendant's trial, a juror called the Commissioner's Office to report that during the deliberations she "felt threatened" by another juror. She said that while the jury was deliberating, the threatening juror told her, "if you don't change your vote, I will make sure we stay here for weeks." The juror subsequently changed her vote in response to this threat. She also said that in her opinion, there were other jurors who felt threatened and changed their votes accordingly."

9. Maryland Rule 5–606(b) provides:

"(b) Inquiry into validity of verdict.
"(1) In any inquiry into the validity of a verdict, a sworn juror may not testify as to (A) any matter or statement occurring during the course of the jury's deliberations, (B) the effect of anything upon that or any other sworn juror's mind or emotions as influencing the

occurring during the course of the jury's deliberations" or "the effect of anything upon that or any other sworn juror's mind or emotions as influencing the sworn juror to assent or dissent from the verdict," and noting what we said in *Williams v. State*, 204 Md. 55, 71, 102 A.2d 714, 722 (1954), that "under no circumstances would it be admissible to impeach the juror's own verdict at the hearing of the motion for a new trial," the majority concludes that the denial was permissible. *Genies*, op. at 161, 43 A.3d at 1014. Although I agree that, pursuant to Rule 4–331 [10], the decision to grant a new trial is a discre-

----

sworn juror to assent or dissent from the verdict, or (C) the sworn juror's mental processes in connection with the verdict.

"(2) A sworn juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying may not be received for these purposes.

"(3) Notes made under Rule 2–521(a) or Rule 4–326(a) may not be used to impeach a verdict."

**10.** Maryland Rule 4–331, which governs motions for new trial, provides, in pertinent part:

"(a) Within ten days of verdict. On motion of the defendant filed within ten days after a verdict, the court, in the interest of justice, may order a new trial.

"(b) Revisory power. The court has revisory power and control over the judgment to set aside an unjust or improper verdict and grant a new trial:

"(1) in the District Court, on motion filed within 90 days after its imposition of sentence if an appeal has not been perfected;

"(2) in the circuit courts, on motion filed within 90 days after its imposition of sentence.

Thereafter, the court has revisory power and control over the judgment in case of fraud, mistake, or irregularity.

"(c) Newly discovered evidence. The court may grant a new trial or other appropriate relief on the ground of newly discovered evidence which could not have been discovered by due diligence in time to move for a new trial pursuant to section (a) of this Rule:

"(1) on motion filed within one year after the date the court imposed sentence or the date it received a mandate issued by the Court of Appeals or the Court of Special Appeals, whichever is later;

"(2) on motion filed at any time if a sentence of death was imposed and the newly discovered evidence, if proved, would show that the defendant is innocent of the capital crime of which the defendant was convicted or of an aggravating circumstance or other condition of eligibility for the death penalty actually found by the court or jury in imposing the death sentence;

tionary one for the trial court, where, as is the case here, the misconduct or irregularity alleged by the moving party cannot be proven to the satisfaction of the court in the absence of a hearing, it is error for the trial court to deny a party the opportunity to present further evidence or information prior to dispensing with his motion.

Rule 4–331(a), applicable here, provides a trial court with the authority to order a new trial, within ten days of issuing a verdict, "in the interest of justice." We have interpreted that phrase broadly. For instance, in *State v. Devers*, we recognized that:

> "Upon conviction, a new trial may be ordered by the court, upon its own motion, or at the instance of the defendant, or one or more of several defendants, at any time before judgment, for any matter extrinsic to the record whereby it

---

"(3) on motion filed at any time if the motion is based on DNA identification testing not subject to the procedures of Code, Criminal Procedure Article, § 8–201 or other generally accepted scientific techniques the results of which, if proved, would show that the defendant is innocent of the crime of which the defendant was convicted.

"(d) DNA evidence. If the defendant seeks a new trial or other appropriate relief under Code, Criminal Procedure Article, § 8–201, the defendant shall proceed in accordance with Rules 4–701 through 4–711. On motion by the State, the court may suspend proceedings on a motion for new trial or other relief under this Rule until the defendant has exhausted the remedies provided by Rules 4–701 through 4–711.

"(e) Form of motion. A motion filed under this Rule shall (1) be in writing, (2) state in detail the grounds upon which it is based, (3) if filed under section (c) of this Rule, describe the newly discovered evidence, and (4) contain or be accompanied by a request for hearing if a hearing is sought.

"(f) Disposition. The court may hold a hearing on any motion filed under this Rule. Subject to section (d) of this Rule, the court shall hold a hearing on a motion filed under section (c) if a hearing was requested and the court finds that: (1) if the motion was filed pursuant to subsection (c)(1) of this Rule, it was timely filed, (2) the motion satisfies the requirements of section (e) of this Rule, and (3) the movant has established a prima facie basis for granting a new trial. The court may revise a judgment or set aside a verdict prior to entry of a judgment only on the record in open court. The court shall . state its reasons for setting aside a judgment or verdict and granting a new trial."

appears that there was a defect of substantial justice at the former trial.... The matter of granting a new trial is discretionary with the trial court; but the defendant is entitled to have the application therefor passed upon and material evidence presented by him received.

"The principal grounds for granting a new trial are, that the verdict was contrary to the evidence; newly discovered evidence; accident and surprise; *misconduct of jurors or the officer having them in charge;* bias and disqualification of jurors (disqualification not entitling to a new trial, however, if there was opportunity to challenge); misconduct or error of the judge; fraud or misconduct of the prosecution, e.g., abuse of argument."

260 Md. 360, 374, 272 A.2d 794, 801 cert. denied, 404 U.S. 824, 92 S.Ct. 50, 30 L.Ed.2d 52 (1971) (quoting Hochheimer, *The Law of Crimes and Criminal Procedure* § 184 at 209–10 (2d ed.1904)) (internal quotation marks omitted) (emphasis added), *overruled on other grounds, In re Petition for Writ of Prohibition,* 312 Md. 280, 539 A.2d 664 (1988). Indeed, the Court of Special Appeals has acknowledged that "[t]he list of possible grounds for the granting of a new trial by the trial judge within ten days of the verdict is virtually open-ended." *Love v. State,* 95 Md.App. 420, 427, 621 A.2d 910, 914 (1993). Furthermore, the intermediate appellate court has noted, and I agree, that "[a]lthough tightly constrained by the time limit that it must be filed 'within 10 days after the verdict,' there are no limits on the substantive content of what may be urged under subsection (a) as being 'in the interest of justice.' " *Isley v. State,* 129 Md.App. 611, 633, 743 A.2d 772, 784 (2000), *overruled on other grounds, Merritt v. State,* 367 Md. 17, 785 A.2d 756 (2001). As such, the petitioner was working within relatively flexible parameters in seeking to establish sufficient grounds to justify that, pursuant to subsection (a), a new trial would be in the interest of justice.

The issue of whether a party is entitled to a hearing, upon making such a motion, is governed by Rule 4–331(f). Generally, that section permits the trial court to hold a hearing on any motion filed under the Rule; however, it provides that, when

the motion is based on "newly discovered evidence," pursuant to Rule 4–331(c), as opposed to alleging a right to new trial in the interest of justice, pursuant to Rule 4–331(a), the trial court must hold a hearing if, in accordance with Rule 4–331(e), the motion is "in writing", "state[s] in detail the grounds upon which it is based", and "contain[s] or [is] accompanied by a request for hearing if a hearing is sought." Thus, as long as a section (c) motion is timely filed, and complies with the form requirements set forth in section (e), the trial court "*shall* hold a hearing," if a hearing is requested, and "the movant has established a prima facie basis for granting a new trial." Rule 4–331(f).

The Rule, to be sure, does not contain a comparable mandatory hearing provision for new trial motions filed pursuant to Rule 4–331(a). Nevertheless, I see no reason to apply, to such motions, a different standard for the determination of whether and when a hearing is required. That is especially the case when, as here, the basis for the new trial request is evidence discovered after trial, which, but for the timing of its discovery, could and undoubtedly would be the basis for a section (c) motion. In this case, and under these circumstances, it is clear to me that the petitioner pled sufficient facts to establish a prima facie basis for a new trial. That entitled him to a hearing.

The intermediate appellate court has recognized, and I agree, that "[a]lthough the time constraints are different, there is no substantive difference between what is material and persuasive newly discovered evidence under subsection (c) and under subsection (a). Subsection (c) exists for the exclusive purpose of providing a more extended period of one year within which newly discovered evidence may be urged upon a trial judge as a reason for granting a new trial." *Isley*, 129 Md.App. at 632, 743 A.2d at 783. Indeed, the most significant distinction between subsection (a) and subsection (c), as relevant to the case *sub judice*, is the consequence of an improper denial of a hearing by a trial judge. Specifically, when a subsection (c) motion is filed, and all the requirements of Rule 4–331(f) are met, "in the absence of a waiver by both sides, the

court must conduct a hearing before acting on the motion." *Jackson v. State*, 358 Md. 612, 624, 751 A.2d 473, 479 (2000) (emphasis added); *see also Buck v. Cam's Rugs*, 328 Md. 51, 58, 612 A.2d 1294, 1297 ("[A] trial judge has virtually no 'discretion' to refuse to consider newly discovered evidence that bears directly on the question of whether a new trial should be granted."). Failure to conduct a hearing under those circumstances results in a violation of the rule.

Similarly, in the case of section (a) motions, there are circumstances in which a judge must grant a hearing: when a failure to do so would be an abuse of judicial discretion. Indeed, there is no substantial difference between the allegations under subsections (a) and (c), *see Isley, supra*, such that movants under one, section (c), are entitled to a hearing under prescribed circumstances, while those under the other are entitled only if the judge says they are. Thus, an improper failure to grant a hearing for a motion filed under section (a), since there is no express requirement for a hearing and it does not violate any specific requirement of the rule, is reviewed under an "abuse of discretion" standard. *See Buck*, 328 Md. at 57, 612 A.2d at 1297. Indeed, we have recognized juror misconduct, in general, as grounds for a new trial. *Devers, supra.* It is, therefore, absurd to hold, as the majority does, *Genies*, op. at 171–73, 43 A.3d at 1020–21, that a defendant who, similar to the petitioner, uncovers evidence of jury misconduct within ten days of a trial's conclusion, is not entitled to a hearing, subject, entirely, to a trial judge's discretion, but would be, as mandated by the rule, had he discovered this evidence later.

To be sure, the allegations set forth by the petitioner in his "(a)" motion, had the facts surrounding the jury misconduct been discovered more than ten days after the conclusion of trial, would have been sufficient grounds to establish "a prima facie basis" for a new trial and, thus, entitle him to a hearing.[11]

---

11. As we have seen, a movant who timely files a motion under subsection (c) and complies with the form requirements set forth in subsection (e) is entitled to a hearing if he establishes a "prima facie basis" for a

The allegations of juror misconduct that the petitioner proffered, if true, would establish that his or her right to a fair trial was infringed, entitling him or her to a new trial. Having pled facts that presented a prima facie basis for granting a new trial, as he would have been had the motion been one pursuant to section (c), *see* Rule 4–331(f), the petitioner was entitled to a hearing to prove those allegations; the trial court abused its discretion in ruling otherwise. Any other result is simply illogical. It makes no sense to hold that the petitioner,

---

new trial. The term "prima facie," literally translated from the Latin, means "[a]t first sight; on first appearance but subject to further evidence or information." BLACK's LAW DICTIONARY 1310 (9th Ed.2009). A party required to make out a prima facie case carries that burden when he or she produces sufficient "[e]vidence that will establish a fact or sustain a judgment unless contradictory evidence is produced." *Id.* at 638. Where, as is the usual case, there is a hearing or trial, the *prima facie* case showing is necessary to avoid an adverse ruling and, ordinarily, the burden is one of production, for example, in a preliminary hearing, to avoid dismissal of charges. *See Davis v. Quille,* 248 Md. 631, 633, 237 A.2d 745, 746 (1968) ("[P]reliminary hearing is ... only for the purpose of establishing a prima facie case against the defendant."). On the other hand, however, when the *prima facie* showing is necessary to obtain affirmative relief and is to be made preliminary to a hearing, the showing is a pleading burden. To be entitled to a hearing, therefore, that party has to allege facts that, if true, would establish the required fact, which, in turn, would ensure him, or her, the forum and the opportunity to establish that they are true.

In the former setting, the party with the burden has the forum and the opportunity to present the supporting evidence. Contrastingly, in the latter scenario, the question is answered solely on the basis of the allegations proffered by the party. The Supreme Court of Alabama recognized this key distinction, emphasizing the importance, in post-conviction proceedings, of not requiring a petitioner to satisfy his "ultimate evidentiary burden ... at the pleading stage...." *Ex parte Hodges,* No. 1100112, —— So.3d ——, —— – ——, 2011 WL 3780100, at *2–*3 (Ala. Aug. 26, 2011) (citing *Johnson v. State,* 835 So.2d 1077, 1079–80 (Ala.Crim.App.2001)) ("A claim may not be summarily dismissed because the petitioner failed to meet his burden of proof at the initial pleading stage, a stage at which the petitioner has only a burden to plead."). The issue in this case is whether, in a non-section (c) motion, a court may dispose of a motion for new trial that states a prima facie basis for the relief sought, without allowing the defendant the opportunity to present evidence, or whether the court must conclude, on the basis of the allegations, "at first sight," that the party is entitled to a favorable judgment on the motion, "subject to further evidence or information." I believe the latter is the proper approach.

in this case, was not entitled to a hearing on the basis of evidence which, had it been discovered eleven days after the conclusion of trial, rather than within ten days, would have *required* the trial court to grant him a hearing. Furthermore, and in more direct response to the majority's position, *Genies,* op. at 171–73, 43 A.3d at 1020–21, the petitioner need not have disclosed, and indeed may have been unable to at the time the motion was due, all of the evidence on the proffered basis for new trial that he would present. *See Ex parte Hodges,* No. 1100112, —— So.3d ——, ——, 2011 WL 3780100, at *2 (Ala. 2011); *Johnson v. State,* 835 So.2d at 1079–80. Moreover, at the pleading stage, the trial court is not required to, nor should it, assess, before it is offered, the quality of the evidence. If that is the trial court's role, Rule 4–331 is essentially meaningless.

Our expansive interpretation of "in the interest of justice," as demonstrated by *Devers, supra,* as well as the ends of justice, are served, and given meaning, when movants are provided with the opportunity to be heard upon proffering allegations sufficient to call into question the fairness of the trial. Indeed, in *Jackson v. State,* 358 Md. 612, 625, 751 A.2d 473, 479–80 (2000), in the context of Rule 4–331, we recognized the importance of a hearing:

"Even when afforded only by rule, and not as an incident of due process of law, the right to a hearing is of fundamental importance. It represents an assessment by us of the significance of the matter under consideration, at least to the parties, and, given that significance, of their right, if they choose to exercise it, to present directly to the court, *viva voce,* the reasons why they should prevail. It is a recognition that personal, vocal communication with the judge may not only itself be a more effective means of persuasion than written documents that may be read hurriedly and not fully appreciated or understood, but that a hearing offers at least a limited opportunity for dialogue, allowing for clarification, for greater precision, for addressing concerns harbored and expressed by the judge. It is a right that, ordinarily, may be waived, but when not waived,

we are loathe, in the absence of extraordinary circumstances, to find its denial harmless. It would often be a matter of pure speculation whether prejudice ensued—whether, had the party been given the opportunity to make his or her "pitch" at a hearing, the result may have been different—and that is much more likely the case when the decision may rest upon the resolution of factual disputes or the exercise of discretion and judgment."

*Id.* I believe that the reasoning we adopted in *Jackson* is fully applicable to the case *sub judice.*

It is true that Rule 4–331(f) leaves the decision of whether to grant a hearing upon a motion filed under Rule 4–331(a) squarely within the discretion of the trial court. Where, however, a defendant's constitutionally guaranteed right to a fair trial is at stake, when sufficiently pled, any misconduct or irregularity that may have affected the outcome of the trial must be fully addressed. Even a cursory review of the facts of this case demonstrates that, had the juror truly been threatened, and had that threat, indeed, caused her to change her vote, a great injustice would have been done to the petitioner, and his right to a fair trial impermissibly infringed. While it is true that the petitioner may have been limited, by Rule 5–606(b), in the evidence he would be permitted to present at the hearing, that is not the relevant consideration for the trial court in deciding whether to grant a hearing in the first place. Additionally, while it is entirely within the trial court's discretion to determine, after the hearing, the sufficiency of the showing that a defendant has made, that is not the test, at the motion stage. Neither section (a) nor (f) of Rule 4–331 contemplates that the trial court will determine, in advance of the hearing, the ability of the moving defendant to produce sufficient evidence to support the allegations in his motion.

Furthermore, the petitioner could not possibly demonstrate, to the satisfaction of the court, that there was, indeed, juror misconduct, a permissible ground for granting a new trial, without a hearing. It was not for the court to decide, before giving the petitioner the opportunity to present his evidence,

and to tell his side of the story, that he would not be able to produce enough of it or tell his story effectively. Rule 4–331's grant of discretion simply does not reach that far.

It is my position that the petitioner pled a sufficient basis for new trial and, therefore, as contemplated by the Rule 4–331, was entitled to a hearing, at which evidence of those allegations could be presented. Accordingly, I dissent.

Judge GREENE has authorized me to state that he joins in this dissenting opinion.